## THE MIKADO, ETC., CASE.

### CARTE v. DUFF.

#### (*Circuit Court, S. D. New York.* September 16, 1885.)

COPYRIGHT—OPERA — DEDICATION TO PUBLIC— PUBLICATION OF LIBRETTO AND
VOCAL SCORE IN FOREIGN COUNTRY — RETENTION OF ORCHESTRATION — IN-
FRINGEMENT—PRODUCTION WITH NEW ORCHESTRATION—INJUNCTION.

Carte, an alien, purchased from Gilbert and Sullivan, British subjects, their
right of public representation in the United States of the comic opera "The
Mikado, or the Town of Titipu," of which Gilbert was the author of the
literary parts, and Sullivan the author of the musical parts. They employed
one Tracey, a citizen of the United States, to come to London and prepare a
piano-forte arrangement from the original orchestral score, with a view to
copying the same in the United States. After Tracey made the piano arrange-
ment, proceedings were taken to copyright it as a new and original composi-
tion in the United States, and Carte purchased the title of Gilbert, Sullivan, and
Tracey to such copyright. After the recording in the office of the librarian of
congress of the title of this arrangement, the libretto and vocal score of the
opera and piano-forte arrangement of Tracey were published and sold in Eng-
land, with the consent of Gilbert and Sullivan. The orchestral score was never
published, but kept by Gilbert and Sullivan for their own use and that of li-
censees to perform the opera. Duff purchased in England a copy of the libretto,
vocal score, and piano-forte arrangement, and procured a skillful musician to
make an independent orchestration from the vocal score and piano score, and
was about to produce the opera in New York city, with words and voice parts
substantially the same as those of the original, and with scenery, costumes,
and stage business in imitation of the original, and with the orchestration
which he had procured to be made, and without claiming that he employed the
orchestration of the original opera, when Carte sought to enjoin the public
representations. *Held*, that the publication of the libretto and vocal score of
the opera in London with the consent of the authors was a dedication of their
playright, or entire dramatic property in the opera, to the public, notwith-
standing their retention of the orchestral score in manuscript, and the public
representation would not be enjoined.

In Equity.

*Joseph H. Choate* and *Causten Browne*, for complainant.

*A. J. Dittenhoefer* and *A. J. Vanderpool*, for defendants.

WALLACE, J. The complainant, as a purchaser from William S.
Gilbert and Arthur Sullivan, British subjects, residing in London,
has acquired their right of public representation in the United States
of the comic opera "The Mikado, or the Town of Titipu." The opera
was the joint composition of Gilbert and Sullivan, Gilbert being the
author of the literary parts and Sullivan of the musical parts. In
order, if possible, to protect their property in the opera in the United
States they employed George L. Tracey, a citizen of the United
States, to come to London and prepare a piano-forte arrangement of
the opera from the original orchestral score, with a view to copying
the same in the United States. After Tracey made the piano-forte
arrangement, proceedings were taken to copyright it in this country
as a new and original composition of Tracey. The complainant has
acquired the title of Gilbert, Sullivan, and Tracey to the copyright.
After the title of the piano-forte arrangement had been entered in the

office of the librarian of congress, the libretto and vocal score of the opéra and the piano-forte arrangement of Tracey were published and sold to the public in England with the consent of Gilbert and Sullivan. The orchestral score was not published, but has always been kept by Gilbert and Sullivan in manuscript for their own use and that of their licensees to perform the opera. The defendant purchased in England a copy of the libretto, vocal score, and piano-forte arrangement and procured a skilled musician to make an independent orchestration from the vocal score and piano score. He was about to produce the opera at the Standard Theater in the city of New York, with words and voice parts substantially the same as those of the original, and with scenery, costumes, and stage business in imitation of the original, and with the orchestration which he had procured to be made, when the complainant filed his bill in equity to restrain the defendant from the public representation of the opera. A motion has been made for a preliminary injunction.

As the complainant is an alien and the defendant is a resident citizen, the requisite diversity of citizenship exists between the parties to enable this court to take jurisdiction and protect the equities of the complainant, whether they are founded upon the common-law right of public representation of the opera which he has acquired from the authors, or whether they are founded upon his statutory rights created by the laws of the United States, and vested in him by the acquisition of the copyright of the piano-forte arrangement. A resort to statutory copyright in the United States was indispensable if the authors desired to make publication of their work in print in England, and yet retain the right to control its dramatic representation in this country. They were well advised that, until publication of their manuscript, their exclusive right to multiply copies of their work and control its production upon the stage would be intact, but that after publication this right would become public property unless saved by statutory protection. Common-law rights of authors run only to the time of the publication of their manuscripts with their consent. After that the right of multiplying copies, and, in the case of a dramatic work, of representation on the stage, by the rule of the common law is abandoned to the public. It is immaterial whether the publication be made in one country or another. Such rights of authors as are saved by statute are not recognized extraterritorially. They can only be enforced in the sovereignty of their origin. No one questions the justice of the claim of the author of any intellectual production to reap the fruits of his labor in every field where he has contributed to the enlightenment or the rational enjoyment of mankind. It was, therefore, entirely legitimate for the authors of this opera to avail themselves of any provision they could find in the laws of the United States which might protect them in the right to control its dramatic representation in this country. The production of the opera upon the stage would have been practically impossible if they could have

retained for themselves the exclusive right to use the musical parts. They sought to do this by retaining the orchestral parts in manuscript, and copyrighting the essential elements in their most simple form under our laws, through the intervention of an arranger, who, as a citizen of the United States, was capable by our statutes of securing a copyright which could be transferred to them. Unless, however, the piano-forte arrangement would be a new and original production of the arranger, it could not be the subject of a copyright. If it would be a new and original production, it could not be reconverted into an operatic score by a third person, within the authority of *Boosey* v. *Fairlie*, 7 Ch. Div. 307, S. C. 4 App. Cas. 711, without infringing the copyright.

The plan adopted was an ingenious one. It encounters several obstacles. *First*, it is urged that the piano-forte arrangement of Tracey is not a new and original work, because the arranger merely takes from the orchestral score the notes of the instruments used for playing the melody, and selects the notes of the chord in its simple form and transfers them to this score in the sequence in which they appear in the orchestral score; that he originates nothing, composes no new notes or melodies, and simply culls the notes representing the melodies and their accompaniments expressed by the naked chord. Also, it is insisted that the attempt by the authors of the opera to secure to themselves the sole right of representation here must fail, because it is condemned by the policy of our copyright laws, which are enacted for the protection of our own citizens only in their rights of literary property. It is also insisted that if these objections should be held untenable, the copyright here is invalid for non-observance of several statutory conditions.

It will be unnecessary to consider some of the interesting questions which were discussed at the hearing, because, as will be seen, the whole controversy turns upon a single and narrow point. In any aspect of the case, the complainant is not entitled to the relief sought if the publication of the libretto and vocal score of the opera in London with the consent of the authors was a dedication of their playright or dramatic property in the opera to the public. So far as he relies upon his title to the copyright of Tracey's piano-forte arrangement, it is not apparent, assuming his title to be valid, how he can rest his claim to the relief sought upon this ground. Strictly, the only invasion of a copyright consists in the multiplication of copies of the author's production without his consent. Any other use of it, such as for the purpose of public reading or recitation, is not piracy. *Reade* v. *Conquest*, 9 C. B. (N. S.) 755; *Tinsley* v. *Lacy*, 1 Hem. & M. 747. But the copyright laws of congress recognize the playright of the author or proprietor of a dramatic composition, and secure to him the exclusive privilege of its public representation upon the stage. The defendant has not used the piano-forte arrangement except to avail himself of it in making an orchestral score. He does not em-

ploy it or intend to use it in his public representation of the opera. Therefore, if it should be conceded that a piano-forte arrangement is a "dramatic composition" within the meaning of our copyright laws, this concession does not help the complainant unless he can maintain successfully that performing the opera with an orchestration prepared from the piano score is a public representation of the piano-forte arrangement. The English statutes protect composers against the unauthorized performance of a musical composition, and it is therefore needless to say that *Boosey* v. *Fairlie,* in which the performance of an opera was restrained in a case where the composer's orchestration was arranged for the piano-forte, and the piano-forte arrangement reconverted into a new orchestration, is an authority which is not applicable under our laws.

The proposition is too plain for discussion that if the authors of "The Mikado" had published the orchestral score of their opera as well as the libretto and vocal score, they would have completely lost both their playright and copyright in their dramatic musical composition. It is equally plain that the exclusive right in Gilbert and Sullivan to publicly represent any part of the opera, except their orchestration, did not survive their publication of the libretto and vocal score. The dialogue, stage business, and the words and melodies of the songs as intended to be sung by one or more persons, or by the chorus, comprising the opera as an entirety, except the instrumental parts, were dedicated by this publication to the use of the public. It was lawful, consequently, for the defendant to avail himself of all this, however unfair commercially or reprehensible in ethics his conduct may be. In the language of the court in *Keene* v. *Kimball,* 16 Gray, 546, 551, "the public acquire a right to the extent of the dedication, whether complete or partial, which the proprietor has made to the public."

The question, then, is whether any part of the dramatic properties of the opera remained in the authors by reason of the fact that they have always retained the orchestral score in manuscript. It does not seem open to fair doubt that the literary part of an opera, together with the music of the voice parts, comprise all there is of the dramatic essence that lies in the action of the performers. The instrumental parts serve to emphasize the sentiments and intensify the emotions excited by the words and melodies. The artistic merits of the orchestral accompaniment no doubt measurably depend upon the extent to which it vividly and forcibly illustrates the dramatic situations exhibited upon the stage. But the instrumental parts alone are inadequate to convey intelligently to the hearer the dramatic effect communicated by the language and movements of the actors. What constitutes dramatic music has not been distinctly the subject of judicial consideration. The singing of the songs of an opera in public was held to be a dramatic representation in *Planche* v. *Braham,* 8 Car. & P. 68; S. C. 4 Bing. N. C. 17; but the question mainly considered was whether singing was a representation. The case falls

short of the point here. What is a dramatic composition was defined by BLATCHFORD, J., in *Daly* v. *Palmer*, 6 Blatchf. 264, as "a work in which the narrative is not related, but is represented by dialogue and action." Conversely, what is not a dramatic composition is defined by a commentator of authority as follows: "Music designed to be interpreted by instruments alone, as a symphony, can hardly be considered a dramatic work within the meaning of the law." Drone, Copyr. 599. These expressions of opinion coincide with what has been said, and it must be held that, by the publication of the whole opera except the instrumental parts, the authors abandoned the entire dramatic property in their work to the public. The right to represent it as a dramatic composition thereby became public property, although they still retain the sole right of multiplying copies of their orchestral score. If the orchestration of an opera is not a dramatic composition, certainly the piano-forte arrangement cannot be. Consequently, if it should be assumed that the defendant, in representing the orchestration, prepared from the copyrighted arrangement, will be representing so much of the arrangement as is embodied in the orchestration, or, in other words, will use the arrangement in musical form and sequence, notwithstanding he embellishes it with orchestral accessories, the complainant falls short of a case for the relief asked, because representing the arrangement on the stage is not the representation of a dramatic composition, but of a musical composition, as to which complainant's statutory title consists in the sole right of printing, copying, etc., and not of public representation. U. S. Rev. St. § 4952.

While it is much to be regretted that our statutes do not, like the English statutes, protect the author or proprietor in all the uses to which literary property may be legitimately applied, it is not the judicial function to supply the defect. In view of these conclusions, it is not necessary to consider whether a valid statutory copyright for the piano-forte arrangement of Tracey has been obtained, or whether there was a non-compliance in any particulars with the statutory requisites. These questions may be more properly reserved until an attempt is made to infringe the copyright by an unauthorized multiplication of copies. Of course, the defendant could not be permitted to produce the opera as though it were one containing the orchestration of Gilbert and Sullivan. He would not be permitted by deceptive advertisements, or representations calculated to mislead the public, to enter upon an unfair competition with the complainant. He does not profess to employ their orchestration, and the case is free from any element of actual fraud.

The motion for an injunction is denied.