METRO–GOLDWYN–MAYER DISTRIBUTING CORPORATION v. BIJOU THEATRE CO., Inc., et al.

EDUCATIONAL FILM EXCHANGES, Inc., v. SAME.

Nos. 3254, 3255.

District Court, D. Massachusetts.

May 11, 1931.

Hill, Barlow & Homans, of Boston, Mass., for plaintiffs.

John C. Coughlin, of Boston, Mass., for defendant.

MORTON, District Judge.

These are bills in equity to enjoin alleged infringements of copyright on certain moving picture films and for damages. The defendant has moved to dismiss on several grounds.

The first ground, that the plaintiff has brought suits against these defendants in the state court which are now pending, is disposed of by McClellan v. Carland, 217 U. S. 268, 30 S. Ct. 501, 54 L. Ed. 762. See too Consolidated Ordnance Co. v. William T. Marsh et al., 227 Mass. 15, 116 N. E. 394. The second ground argued is misjoinder of parties, the objection being that the exclusive licensee of the owners of the copyright is joined as a party-plaintiff. Inasmuch as it has an interest in the litigation, it has properly been made a party-plaintiff to the suit under Equity Rule 37 (28 USCA § 723). The third ground is that no case is shown for an injunction because there is no allegation of continued or threatened infringement and that, there being no case for injunctive relief, the equity of the bill fails. The answer to this is found in the statute (17 USCA § 25), which provides that a suit for damages may be combined with one for an injunction. It follows that though the injunction be denied the case may stand as one for damages.

The other grounds are more basic and important, viz., that the unauthorized showing of a motion picture does not constitute a violation of the copyright on it; and that the plaintiff, having turned over the films in question to the defendant under a contract regulating the use of them and providing for arbitration of disputes as a condition precedent to legal action, cannot sue without complying with the terms of the contract, nor maintain an infringement proceeding for acts amounting to a breach of the contract.

As to whether showing a copyrighted motion picture film constitutes an infringement of the copyright: This question seems not to have been decided in any case in which an opinion was written. There is no provision in the statute concerning the scope or effect of the copyright of moving picture films. They were commercially unknown when section 1 of the current act was passed (1909) and are referred to only in the classification section of the statute, being brought in there by the amendment of 1912. As the statute does not in terms give to the proprietor of the copyright the rights contended for by the plaintiff, the question is whether such rights are conferred by the general provisions of section 1, or by implication from those provisions. The only case which throws much light on the matter is Kalem v. Harper Bros., 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, where it was held that the exhibition of a motion picture based upon a dramatization of a copyrighted novel was a dramatic production within the meaning of the copyright law, and consequently was an infringement of the copyright on the novel, because by the statute the copyright owner is given exclusive control of dramatization and dramatic performance of his work. The point decided was as to the scope of the copyright on the novel "Ben Hur."

The present question is different. Here the film itself is the subject of the copyright. Nobody questions that the plaintiff has the exclusive right to control copying it. If the film were an ordinary photograph or transparency, nobody would contend that the mere exhibition of it violated the copyright. The understanding of Congress that it does not do so in the case of a moving picture film is established with very unusual clearness. The point was explicitly raised and discussed in connection with the amendments of 1912. During the debate on them in the House, apprehension was expressed lest the exhibitor be made liable as an infringer of the copyright; and the following colloquy occurred:

Mr. Borland: "Would not the gentlemen be willing to consent then that the penalty should apply against the men who made the film?"

Mr. Townsend (who was in charge of the bill): "That is the intention of the law."

Mr. Borland: "And that the exhibitor should not be liable for an innocent infringement?"

Mr. Townsend: "That was the understanding of the lawyers on the Committee."

The rather lengthy discussion from which this excerpt is taken makes it clear that the House understood that neither under the existing law, nor under the proposed amendment, was an unlawful exhibition of the copyrighted film, an infringement of the copyright. It should require unambiguous language in a statute to the contrary to warrant disregarding such clearly proved legislative intent.

The only part of section 1 which can possibly be regarded as having that effect, as it seems to me, is clause (d) relating to "drama" or "dramatic work." If the film itself be regarded as a drama, the Kalem decision applies. The provisions about "drama" and "dramatic work" in this section go back to the Act of 1856 and relate to the written and spoken drama as then known. They have since been revised and extended, the last time in 1909, when as above stated moving pictures were still unknown commercially. No-

body then thought of "drama" or "dramatic work" in terms of motion pictures. A moving picture play is utterly different from anything then conceivable—an entirely new method of communicating ideas.

Copyright statutes were originally intended to control copying. See Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 S. Ct. 722, 52 L. Ed. 1086; Jeweler's Circular Pub. Co. v. Keystone Pub. Co., 281 F. 83, 26 A. L. R. 571 (C. C. A. 2). Until Kalem Co. v. Harper Bros., 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, the development of copyright law had been strictly statutory; it had not been extended by judicial enlargement of existing law. Statutes were required to give authors of dramatic works a monopoly of the spoken performance of them (Act of August 18, 1856 [11 Stat. 138]), and to give composers control of public performances of their music or operas. The Mikado Case (C. C.) 25 F. 183, 187; 17 USCA § 1 (e). When mechanical instrumentalities were invented to reproduce music and sound, statutory action was again necessary in order to protect composers; it being held that the copyright on the printed music did not give a monopoly of audible reproduction of it by perforated rolls. White-Smith Music Pub. Co. v. Apollo Co., 209 U. S. 1, 28 S. Ct. 319, 52 L. Ed. 655, 14 Ann. Cas. 628. There are now special provisions in the statute dealing with talking-machine records (section 1, e), and also special provisions concerning infringement by mechanical reproduction which is, however, limited to musical works (section 25). As a general rule, the effect of a new invention in any given field seems to be a matter for legislative consideration, rather than for the extension of existing statutes by judicial construction. Cases supra; and see McBoyle v. United States (March 9, 1931), 51 S. Ct. 340, 341, 75 L. Ed. ——, where the Dyer Act (18 USCA § 408), relating primarily to stolen motor vehicles, which by its terms included "any other self-propelled vehicle not designed for running on rails," was held not to apply to airplanes. I do not understand that the Kalem Case supra, and Buck v. Jewell-La Salle Realty Co. (April 13, 1931) 51 S. Ct. 410, 75 L. Ed. ——, repudiate this historic approach to such questions.

While old language will often apply to unforeseen conditions and that of section 1 has much breadth, I do not think that a moving picture film can be regarded as having the copyright privileges of a "drama" or "dramatic work" within this subsection, in the face of an obvious intent to the contrary by Congress, nor that the mere exhibition of it infringes the copyright. The opposite conclusion would work a discrimination between films which are dramatic in character, and others, e. g. of sports, explorations, news, etc., which are not, and would put into the hands of the copyright owner powers which might be very oppressively used—a possibility which was suggested during the debate in Congress and is well illustrated by Metro-Goldwyn-Mayer Distributing Corp. v. Zotos (Eastern District of Missouri, 3 July 1930 [1]), referred to in a brief submitted for the plaintiff, where, in a case like the present, damages of over $13,000 were awarded against the defendant, while the rental for his unauthorized use of the films would have amounted to only $186.

The next question is whether, assuming that an unauthorized exhibition of a copyrighted film would be a violation of the copyright, the plaintiff is precluded from maintaining this suit for infringement because of the contract which it made with the defendant. The contract is referred to in the bill and is brought into the case in its complete form by stipulation. It provides for the furnishing of films by the plaintiff to the defendant and licenses the use of them on the terms and conditions therein stated; and it includes elaborate provisions for arbitration of all disputes arising between the parties to it, compliance with which is by its terms made a condition precedent to any right of legal action. It appears to be substantially the same contract which was before the Supreme Court in Paramount Famous Lasky Co. v. U. S. (November 24, 1930), 282 U. S. 30, 51 S. Ct. 42, 75 L. Ed. 145, and the arbitration clauses of which were there held to be illegal under the Sherman (15 USCA §§ 1–7, 15) and Clayton Acts (38 Stat. 730).

It is, of course, well settled that an illegal part of a contract may be so separable from the rest of it that the other provisions can still be enforced. Whether they are so separable is a question of fact. In Paramount Famous Lasky Corp. v. National Theatre Corp. (C. C. A. 4th, April 13, 1931) 49 F.(2d) 64, it was held that the arbitration provisions of the contract in question were of this separable character, and that the decision they were illegal—which rendered performance of them impossible—excused both parties from performing them. It has long been the custom of this circuit for courts of

[1] No opinion filed.

first instance to follow the decision of a Court of Appeals unless convinced that it was clearly wrong. As applied to the facts in this case, that decision leads to such an unjust result as to throw doubt upon its soundness, and to indicate strongly that the arbitration provisions were not a separable part of the contract. While I should have reached the opposite conclusion, the decision does not, however, seem to me so clearly wrong as to warrant my refusal to follow it. I therefore hold that the arbitration provisions do not bar the plaintiff from maintaining the present suit.

The final question is whether a copyright owner, who has entered into a complete contractual arrangement with another person for the use by the latter of the copyrighted matter, can invoke against the other party to the contract the penalties of infringement of copyright for what is really only a violation of contract.

I had occasion recently to consider a somewhat similar point, viz., whether a patentee who had obtained a decree and an injunction against a defendant, and had thereafter licensed the defendant under the patent, could maintain that violations of the license agreement made the defendant an infringer and in contempt of the injunction. Upon a careful examination of the law, I held that as the parties had seen fit to put their arrangements on a contractual basis, the plaintiff was not entitled to use the club of the injunction to punish the defendant for breach of contract. American Pastry Products Co. v. United Products Co. (D. C.) 39 F.(2d) 181, and cases cited. The same reasoning is applicable here. The copyright statutes are designed to protect authors and composers against piratical appropriation of their work. They ought not to be used as a means of imposing severe penalties on a licensee for violation of a contract—especially where, as here, the license agreement contained an arbitration clause relieving from such penalties. There are many provisions in the contract which might be violated by an exhibitor, and the plaintiff's contention if sustained would open the door to great abuses. All damages suffered are, of course, recoverable under the contract.

To permit the plaintiffs to recover would be deeply inequitable. Such a result would in effect recognize the injunction against the plaintiffs in the government suit not only as an excuse for their nonperformance of the arbitration clause by which the exhibitor was assured reasonably fair business treatment, but also as relieving them of the entire contract; and it would permit the plaintiffs after having put their relations with the defendant on a contractual basis to repudiate because of their own misconduct the contract—on which they can still sue even if Paramount Famous Lasky Corp. v. National Theatre Corp., supra, be sound—under which recovery would be limited to actual damages, and to obtain in lieu thereof the very large penalties which the statute provides for infringement.

Bills dismissed, with costs.