## MOMAND v. UNIVERSAL FILM EXCHANGE, Inc., et al.
### No. 7024.
### District Court, D. Massachusetts.
### Feb. 13, 1947.

470

472

See, also, D.C., 6 F.R.D. 222.

George S. Ryan, of Boston, Mass., for plaintiff.

Edward F. McClennen and Jacob J. Kaplan, both of Boston, Mass., for defendants.

WYZANSKI, District Judge.

There are before me defendants' motions of January 20 and January 23, 1947 for directed verdicts, defendants' motions of January 22 and January 27 to set aside the verdicts returned on January 22 and to enter judgments for defendants and plaintiff's motion of January 23, 1947 for interest on the verdicts of the jury.

The first of these motions raises issues of general importance under § 7 of the Sherman Act, 26 Stat. 209, as amended by § 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 15. It poses inter alia two problems of fundamental interest in the law of statutory torts: first, the problem of how far a person who is faced with risk of, (or who has already suffered) injury by the tort of another is entitled to recover for harm suffered in an effort to avert further harm [Compare, Restatement, Torts § 919], and second, the problem of how clearly a plaintiff in order to be entitled to recover damages from defendants must segregate the causes of the losses he suffers, and with what certainty he must show how large a factor in those losses was defendants' unlawful conduct [Compare, Restatement, Torts § 912, comment (a) par. 1.]. The setting in which these problems arise is somewhat complicated but for purposes of these motions, it will be enough to summarize the background of the case in the following six paragraphs.

1. June 22, 1937 plaintiff filed suit in this court as the purported assignee of 8 exhibitor companies which formerly engaged in the operation of motion picture theatres in Oklahoma, of one holding company which formerly managed some of those companies, and of one real estate company which formerly was the landlord of those companies. Named as defendants were 8 major motion picture producers: Universal Film Exchange, Inc., Loew's Inc., Metro-Goldwyn-Mayer Distributing Corporation, Twentieth Century Fox Film Corporation, Vitagraph, Inc., R.K.O. Distributing Corporation, United Artists Corporation and Columbia Pictures Corporation.

2. The complaint or, as it was then called, the declaration charged defendants with having conspired to violate the federal Anti-trust laws in respects summarized in the opinion in Momand v. Universal Film Exchange, D. C. Mass., 1942, 43 F. Supp. 996, 1000, par. 7. These respects included (1) limitation of production, (2) regulation of film rental prices, (3) regulation of customer admission prices, (4) allocation of territories, (5) boycott of independent producers, (6) special privileges to producer-controlled theatres, (7) pooling of resources, (8) collective adoption of the practice of "protection" from independent exhibitors, (9) block booking, (10) blind buying, (11) full line selling, (12) checking exhibitors' receipts as part of a system of discriminatory percentage contracts, (13) collective agreement "to coerce all independent exhibitors into arbitrating all claims and controversies with them arising out of contracts licensing the exhibition of films" [Decl. par. 22 (a)], (14) use of a "standard exhibition contract" [Decl. par. 22(b)], (15) "uniform rules for the operation of identical credit systems" [Decl. par. 23], (16) enhancement of minimum admission prices, (17) oppressive practices in connection with execution and performance of contracts, (18) elimination of competing exhibitors through price-cutting, excessive bids for leases, interference with contracts, and acquisition of leases, (19) cross-licensing under patents for talking or sound pictures and (20) impeding independent exhibitors in connection with talking or sound pictures. All twenty aspects of this conspiracy were alleged to have damaged each of the alleged assignors of plaintiff.

3. Defendants' initial defense was the statute of limitations. Judge McLellan having ordered a separate trial of that issue [Momand v. Paramount Pictures Dis-

tributing Co., D.C. Mass., 36 F.Supp. 568, 571] this Court held that Loew's was entitled to a total judgment for it on that defense. Momand v. Universal Film Exchange, D.C. Mass., 43 F.Supp. 996, 1012-1013. This Court also held that the other seven defendants had the benefit of a partial bar of the statute of limitations. [Ibid.] Without restating what has already been reported, it will suffice to say here that this Court ruled inter alia that no recovery could be had against any defendant for alleged wrongs before May 6, 1928 or subsequent to December 31, 1933—and indeed recovery could not be had for all that 1928-1933 period nor on a parallel basis against all seven remaining defendants. Moreover, and this is a point that plaintiff's brief ignores, it was only with respect to the alleged uniform contracts arbitration and credit conspiracies that plaintiff was entitled to reach back into 1928, 1929, 1930, and the first 5¼ months of 1931.

4. Thereafter plaintiff proceeded to final judgment in a pair of cases which he had begun, and which were tried together, in the District Court for the Western District of Oklahoma. A. B. Momand v. Twentieth Century-Fox Film Corporation et al., No. 6516, and A. B. Momand v. Griffith Amusement Co. et al., No. 6517, 37 F.Supp. 649. The defendants in Oklahoma No. 6516 included all eight of the defendants in the Massachusetts case except Metro-Goldwyn-Mayer. But it was conceded [see hearing of October 9 and 10, 1946 in the instant case before me, (Tr. pp. 59-60)] that in 1936, which (according to Ct. Ex. 3, fdg. 2, note 1, p. 2) was a year before action No. 6516 was begun in Oklahoma, Loew's had taken over all the assets and assumed the liabilities of Metro-Goldwyn-Mayer. Upon the basis of that concession I treated Metro-Goldwyn-Mayer as privy to the judgment in Oklahoma No. 6516. [Oct. 9-10 Tr. p. 62, 72, 74-75]. The other defendants in this case I treated as parties to that judgment [Ibid.].

5. That Oklahoma Judgment, [according to my view expressed in rulings on October 9 and 10, 1946 (Tr. pp. 71–76, 80–82)] became a conclusive determination between the parties in the case before me of these among other issues. (1) Defendants by agreement used from May 1, 1928 through June 30, 1930 a Standard Exhibition Contract and took concerted action to enforce the compulsory arbitration provisions therein [Ct. Ex. 3, fdg. 92 (e), p. 70; fdg. 94, p. 71], and those actions were as a matter of law an unreasonable restraint of interstate commerce [Ct. Ex. 3 C-7, pp. 74, 75]. (2) Defendants by agreement from January 1926 until December 1, 1930 adopted and enforced credit committees' rules concerning the credit statement and rating of vendees of theatres who had not assumed the licensing contracts of their vendors. [Ct. Ex. 3, fdg. 92 (d), p. 70; fdg. 94, p. 71], and those actions were as a matter of law a prohibited restraint of interstate commerce. [Ct. Ex. 3, C-6, p. 74]. (3) Defendants had not engaged in a conspiracy with respect to (a) "the self-regulation program" involved in the Production Code [Ct. Ex. 3, fdg. 93, p. 71] or (b) "block booking" [Ct. Ex. 3, fdg. 96, p. 72], or (c) acquisition of theatres [Ct. Ex. 3, fdg. 86 (g), p. 68, or (d) allocation of territories [Ct. Ex. 3, fdg. 86 (h), p. 68], or (e) limitation of production or distribution [Ct. Ex. 3, fdg. 88, p. 69] or (f) insistence that exhibitors should accept films in the order of release or on the day booked for display. [Ct. Ex. 3, fdg. 101 f, p. 82].

6. Accordingly, I ruled that in the case tried before the jury and me, plaintiff could not show that defendants had conspired in ways in which the Oklahoma court had adjudged defendants had not conspired. At the same time, I ruled that in the case tried before me plaintiff had the irrebuttable benefit of the affirmative Oklahoma determinations that defendants during certain periods had conspired with respect to the arbitration provision of the Standard Exhibition Contract and with respect to the credit committees. Moreover, plaintiff remained free to offer proof of any additional conspiracy or combination which would not contradict the findings and conclusions of Judge Broaddus in Oklahoma No. 6516. (R. 925, 926). But as a matter of fact plaintiff did not offer any admissible evidence of any additional conspiracy or combination. Thus, for instance, plaintiff did not as a matter of fact and could not as a matter of law [Ct. Ex. 3,

fdg. 101 (f), p. 82]' show that there was among defendants any implied agreement (or any uniform action from which an agreement could be implied) that exhibitors must show films in the order in which defendants released them or in any other particular order within a playing season.

Consequently, as the case shaped itself in the Massachusetts trial, the only real issues that were left for determination by a jury were whether the arbitration and credit conspiracies were the legal cause of damage to plaintiff's alleged assignors; and, if so, how much was that damage. Indeed, the issues were not even so broad as that, for plaintiff conceded that he had no claim of damage from the credit conspiracy except under Counts 4 and 6 (Clinton and Alva). (R. 1122).

With this background I turn to the evidence respecting the impact of the arbitration conspiracy. Throughout this and all subsequent parts of this opinion I refer to the evidence not as I would estimate it, but in the light most favorable to plaintiff. That is, the test applied is whether there was evidence which would sustain a jury verdict for plaintiff.

The points to which inquiry must be directed are: (1) were any losses sustained by plaintiffs' alleged assignors in complying with defendants' unlawful arbitration demands; (2) were losses sustained by plaintiffs' alleged assignors in efforts to avert harm threatened by defendants' unlawful arbitration conspiracy reasonably related to that threatened harm; and (3) if the answer to either of the first two questions is in the affirmative, did plaintiff with sufficient certainty show that the damages its alleged assignors sustained were caused by the direct or indirect effect of defendants' arbitration conspiracy.

There was no controversy as to how the arbitration conspiracy worked. Defendants had agreed upon a standard form of contract providing for compulsory arbitration. By this device, defendants required exhibitors to agree that disputes and claims under contracts between distributors and exhibitors should be submitted to boards of arbitration; that awards of such boards be accepted as conclusive; that, upon failure of the contracting exhibitor to submit to arbitration or to abide by an award the distributor party to that contract, and all others having like contracts with such exhibitor, must demand security from him on each of their contracts; that those to whom he failed to pay security within a fixed time must suspend service under their contracts until he paid it or complied with the award; that when service under a contract had been so suspended for ten days, the distributor party might cancel it; and that no distributor, having so suspended service, should resume it before the exhibitor furnished the security or obeyed the award. Paramount Famous Lasky Corporation et al. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145. Cf. R. 553–555.

After defendants had conspired to require resort to arbitration, plaintiff's alleged assignors executed many contracts with defendants which included the compulsory arbitration provision.

In the period which was barred by the statute of limitations, some claims for arbitration under the unlawful provision were presented to, but only a very few, probably no more than two, were paid by plaintiff's alleged assignors: for example, $40 was paid at Pawhuska in April 1927 and $44 was paid at Shawnee in 1925 or 1926 (R. 535; Ct. Ex. 3, fdg. 114-1, p. 111).

In the period which was not barred and was open for consideration by the jury, plaintiff, after making diligent search (R. 741, 742) produced only 21 specific claims for arbitration made against the ten companies from which in this suit he alleges that he has assignments (Schedule A, attached hereto). The highest value of the claims against any one company was $1,945.50 (Pl. Ex. 52, 111). The total value of the claims against all ten companies was $10,322.35 (Schedule A).

Not a penny was paid on any one of these claims (R. 551, 740, 921, 922).

Not one of these claims was presented after January 3, 1930 (Schedule A., R. 748).

The presentation of these claims was not part of a formal or informal conspiracy to use the Standard Exhibition Contract

or the arbitration provisions thereof for the express or implied purpose of inducing plaintiff's companies to show films as they were released or in any other particular order. [Ct. Ex. 3, fdg. 101(f), p. 82]. If any individual defendant used an arbitration claim for such a purpose its action was not a part of or a result of the conspiracy but was its individual action. (Ibid.)

There was no evidence that a defendant ever presented a specific claim for arbitration with the express or implied purpose of inducing one of plaintiff's companies to enter into future contracts or new obligations disadvantageous to those companies. Whenever a defendant's representative discussed an arbitral claim with a representative of plaintiff's companies his ostensible and, so far as appears, his real purpose was to require plaintiff's companies to perform what defendant's representative regarded as those companies' existing commitments on old or past contracts. (R. 537–748, 810, 848, 849, 854, 860, 912–919, 923–925).

Despite the Court's efforts to elicit specific data (R. 532, 745–748) plaintiff did not offer evidence of a single specific prejudicial obligation, to which one of his companies was not already committed, which it undertook in order to escape a specific arbitration claim or a specific threat of arbitration. (R. 745–747, 862, 863). His testimony, at best, referred to general prejudice suffered by his companies. (R. 745–747, 813).

Moreover, in the only two years, 1928 and 1929, when defendants presented specific claims for arbitration plaintiff's companies at Hartshorne, Holdenville, Pawhuska and Alva had higher gross receipts and better earnings than they had in the subsequent years 1930, 1931, 1932 and 1933 when defendants presented no specific claims for arbitration (Schedule A).

The facts set forth in the seven preceding paragraphs lead to the following conclusions of law with respect to the arbitration conspiracy.

Plaintiff can not recover for any expenditures made in meeting arbitration claims because no such expenditures were made.

Plaintiff for the following six reasons can not recover the losses his companies may have sustained from the contracts, arrangements or obligations which they undertook in order to avoid actual arbitration or threats of arbitration or from those companies' failure to secure films from defendants.

1. If the claim is that defendants collectively conspired to use the arbitration machinery as a lever to procure particular playing dates or contractual arrangements which caused loss to the plaintiff's companies, that claim is foreclosed by estoppel by judgment. [Ct. Ex. 3, fdg. 101(f), p. 82. Restatement, Judgments, § 68(1): Myers v. International Trust Co., 263 U.S. 64, 71, 44 S.Ct. 86, 68 L.Ed. 165; Oct. 10, 1946 Tr. 80, 81].

2. If the claim is that defendants individually used arbitration claims or threats thereof with the intent of procuring from plaintiff's companies the performance of overdue obligations under outstanding contracts, there are several obstacles to recovery. (a) This is an action against defendants for damages from their conspiracy. It is not an action against them for their individual torts. Indeed if it were an action on account of individual wrongdoing it might be barred by the statute of limitations. Being an action against defendants for conspiracy recovery can be had only for conduct which "the conspiracy contemplated and embraced." Cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 858, 84 L. Ed. 1129 (a criminal case, but indistinguishable in principle). Conspirators are chargeable with the acts of their fellows only if the acts are done in the furtherance of the joint venture as all understood it; they are not to be held for what some of the conspirators, unknown to the rest, do beyond the reasonable intendment of the common understanding. Cf. United States v. Crimmins, 2 Cir., 123 F.2d 271, 273 (another criminal case). And in this case the Oklahoma judgment finds that "the insistence on the part of any distributor that Momand accept the films in the order of their release or on the day booked for display * * * was not the result of concert or agreed action of the distribu-

tors." [Ct. Ex. 3, fdg. 101(f), p. 82]. (b) Quite apart from the point just made, plaintiff can not recover because his companies were not damaged. Even though the arbitral device was invalid, the provisions of outstanding contracts which imposed obligations on plaintiffs to show pictures, to make rental payments and to perform other substantive covenants were valid provisions. Paramount Famous Lasky Corp. v. National Theatre Corp., 4 Cir., 49 F.2d 64; MGM Dist. Corp. v. Bijou Theatre Co., D.C.Mass., 50 F.2d 908, 910, 911; Columbia Pictures Corp. v. Bi-Metallic Inv. Co., D.C.Colo., 42 F.2d 873. See Ct. Ex. 3, p. 75, note j. And if defendants used an unlawful device to enforce lawful obligations, recovery can not be had of more than nominal damages, if those. Indeed even nominal damages would be improper under the rule laid down in Neville v. London Express Newspaper Ltd. [1919] A.C. 368. There the House of Lords denied any recovery to a plaintiff who claimed that defendant's champerty and maintenance had caused him to pay his obligations to third persons. Lord Chancellor Finlay stated that:—"It cannot be regarded as damage sufficient to maintain an action that the plaintiff has had to discharge his legal obligations or that he has incurred expenses in endeavouring to evade them." (p. 380).

■ 3. If the claim is that defendants individually used arbitration claims or threats thereof with the intent of procuring from plaintiff's companies their assent to fresh obligations under new contracts prejudicial to those companies, (and if estoppel by judgment is not, as suggested in paragraphs 1 and 2 above, a bar) plaintiff's companies can not recover because the evidence does not support the claim of such an intent on the part of any defendant. Thus there is no occasion to invoke the rule that a defendant may be held for a wrong that he intends and thus foresees. Compare Restatement, Torts § 918(2); Mayne, Damages, 10th ed., pp. 42, 88.

■ 4. If the claim is that defendants collectively or individually refused plaintiff's companies the right to rent films because of those companies' failure to meet arbitration claims presented by defendant, the evidence does not show any such refusals on that ground.

■ 5. If the claim is that plaintiff's companies voluntarily undertook specific fresh obligations under new contracts prejudicial to them with an intent on their part to avert specific payments to defendants upon defendants' unlawful claims of arbitration, the evidence does not show any such specific action.

■ 6. If the claim is that plaintiff's companies voluntarily undertook general future obligations under new contracts prejudicial to them with an intent on their part to avert general harm from defendants' arbitration claims and threats thereof, and that the losses incurred under those obligations are recoverable, the recovery can not be had because the losses were not suffered in a reasonable effort to avert harm threatened and to avert future harm.

■ The sixth reason just stated deserves elaboration. The general principle which is at least as old as Lord Ellenborough's decision in Jones v. Boyce (1816) 1 Stark. 493, and is familiar in ordinary, Texas & Pac. R. Co. v. Hill, 237 U.S. 208, 214, 215, 35 S.Ct. 575, 59 L.Ed. 918; United States v. Chesapeake & Ohio R. Co., 4 Cir., 130 F.2d 308, 310; Chesapeake & Ohio R. Co. v. United States, 4 Cir., 139 F.2d 632, 633, and extraordinary tort cases, Den Norske Amer. Act v. Sun Print & Pub. Co., 226 N.Y. 1, 122 N.E. 463; McCormick, Damages (1935) pp. 152–158; Winfield, Law of Tort, pp. 446–448) as well as in the admiralty, The Bywell Castle, 4 P. D. 219 (1879), and even in contract cases when special damages are foreseeable, The Ada, D.C.S.D.N.Y., 239 F. 363, 369, reversed on other grounds 2 Cir., 250 F. 194; Le Blanche v. London & Northwestern Ry. Co., L.R. 1 C.P.Div. 286 (1876); Williston, Contracts (Rev.Ed.) § 1354 vol. V, p. 3798; Mayne, Damages, 10th Ed., p. 95, has been stated in these words in Restatement, Torts § 919:

"§ 919 (1) A person whose legally protected interests have been endangered by the tortious conduct of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert the harm threatened.

"(2) A person who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert further harm."

As the rule is stated, and as the decisions of Judge Learned Hand in The Ada and the English court in the Le Blanche case illustrate, expenditures are recoverable only if they are "reasonably made" and harm is compensable only if it was the result of a "reasonable effort to avert the harm threatened" and "further harm."

Here that standard was not met, and plaintiff's companies' course of conduct in averting defendants' unlawful acts can not be regarded as so reasonable as to charge defendants with those companies' losses. This conclusion is clear as a matter of law from the following four paragraphs.

 1. Defendants' unlawful acts in connection with the arbitration conspiracy had injured plaintiff's companies in the amounts of $84 in out-of-pocket expenses (R. 535. Ct. Ex. 3, fdg. 114-1, p. 111). Defendants had presented additional specific arbitration claims involving an additional $10,322.35. (Schedule A.) Defendants' general threats of arbitration involved an unspecified further potential liability probably of the same order of magnitude. Yet to avert these potential losses of tens of thousands of dollars, plaintiff's companies incurred losses of hundreds of thousands of dollars.

2. While this threatened harm was no doubt unlawful and burdensome, it was a harm threatened to the financial and not to the physical or even appreciably to the reputation interests of plaintiff's companies. Thus it had an obvious, precise and measurable value in dollars and cents.

3. It was a harm threatened over a long period of time, and plaintiff's companies were not forced, as the English cases say, to make a decision in the "agony of the moment." The companies had the opportunity to reflect and to choose the most prudent course. They always had a familiar legal remedy founded upon § 4 of the Clayton Act. And, in the light of § 5 of that Act, 15 U.S.C.A. § 16, they had a relatively simple case to prove once the government,

Ex. Compare United States v. Paramount which began its suit in 1928 or 1929, (Pl. Famous Lasky Corp., D.C.,S.D.N.Y., 1929, 34 F.2d 984), had secured a final judgment enjoining the arbitration provisions of the Standard Exhibition Contract. Paramount Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145.

4. While defendants' claims and threats were violations of a major statute of the United States and were offensive to an important public policy, and therefore plaintiff's companies had considerable latitude in selecting an alternative and indeed an expensive course to avert complying with defendants' criminal demands, the particular course those companies chose was so disproportionately extravagant that it can not be charged to defendants. To decide otherwise would (if the treble damage provisions of the Anti-trust statutes are taken into account) permit plaintiff to recover over a million dollars to avoid specific claims of $10,322.35—that is, a recovery one hundred times the specifically threatened damage.

Nor can plaintiff be allowed on the record in this case to recover some proportion of the losses he says he has suffered on the theory that some losses could reasonably have been incurred to avert compliance with defendants' conspiracy.

In the first place, the pleadings do not seek any such recovery. Indeed it is doubtful whether plaintiff's counsel now or at any earlier stage of these proceedings has ever pitched his case to a possible recovery upon the basis of principles such as are set forth in Restatement, Torts § 919. His theory, which I have already said I regard as untenable, has been that defendants conspired to force plaintiff's companies to take playing dates they did not want or to forego films entirely; and that defendants conspired to use arbitration as a lever to force plaintiff's companies to submit to new obligations which they did not desire.

In the second place, the evidence is so obscure that it would be impossible rationally to arrive at a finding of what losses would have been reasonable. Plaintiff was unable to show that to meet any particular claim of arbitration his companies entered

into a specific new obligation which was disadvantageous to them. Thus it can not be said that the obligations the companies incurred were damaging to them and entitled them to recovery. Compare Erie County Natural Gas v. Carroll [1911] A. C. 105, 119 [P. C.]

Finally, if the decisions of Judge Learned Hand and of the English court in two contract cases, The Ada and Le Blanche v. London & N. W. Ry., supra, be a safe guide in cases of statutory torts it could be contended that an injured plaintiff recovers nothing if he embarks on an extravagant course of conduct to avert the consequences of defendant's breach of duty. But this point seems to me so doubtful that I prefer not to rest on it. If B threatens to restrain A's trade, and to appease B, A gives B a Rembrandt portrait when only $5,000 would have been reasonable, it is conceivable that the rule is that A can not recover anything. What A offered was not only extravagant but a specific unity—and the jury can not charge B either with that or with something that A did not offer and B might not have been willing to take. But I am not satisfied that the rule, if it exists, bars A from recovering anything if instead of a reasonable appeasement payment of $5,000 he appeases B by paying $100,000 cash or entering into and performing contractual obligations to give B $100,000.

■ Aside from the grounds heretofore given for a directed verdict on all counts on the aspect of this case connected with the arbitration conspiracy, another ground requires as to counts 1–6, 9 and 10 directed verdicts on the aspects of this case which are connected with both the arbitration conspiracy and the credit conspiracy. I refer to the principle set forth in Restatement Torts § 912 comment (a) to the effect that the recovery of damages for a particular harm is dependent upon proof that the tortious conduct was a substantial factor in causing such harm.

Before turning to the evidence on this issue of causation, an important distinction must be noted. Here I am concerned with the issue of certainty of causation not with the issue of certainty of the amount of damage. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 263 line 10-12, 66 S.Ct. 574, 579, 90 L.Ed. 652; 15 U.S.C.A. § 15.

In the case at bar this is the significant evidence on the issue of causation.

■ When he began his suits plaintiff attributed his companies' losses to literally twenty different categories of wrongdoing by defendants [Declaration]. On the stand on cross-examination (R. 1040–1076) and at various times on direct examination (see appended analyses) he made it clear that he still regarded a great many of those categories as the causes of his loss. Indeed, up to the trial of this case, he always recited causes other than the arbitration conspiracy as the chief explanation of his companies' losses. But because of estoppel by judgment, the statute of limitations and failure of proof of other conspiracies, plaintiff in the trial of this case was driven to relying for recovery solely on the arbitration and credit conspiracies. Being, so far as the jury and I could tell, an honest man, plaintiff found it difficult when he was on the stand to segregate such part of the damage as was caused by those two factors from such as was caused by all the other acts of defendants, acts which he originally regarded and continued to regard, as wrongful and effective but which he was precluded from relying upon as a basis for recovery.

In this dilemma plaintiff on 8 of the 10 counts, and despite the Court's prodding (R. 758, 759) entirely failed to show that the arbitration or the credit conspiracy could be charged with any particular proportion (expressed either in percentage or dollar terms) of the losses—and even more obviously failed to show that the arbitration or the credit conspiracies were a major or the most substantial factor in those losses. This failure finds illustration in the separate analyses of each of the ten counts which are appended to and form a part of this opinion.

For example, to begin with what I regard as a typical sample, on Count 1 the evidence shows that in 1930 there were three causes of loss (none of which is given in dollar or percentage terms or even in order of im-

portance)—lack of qualified major product, booking difficulties and cut-backs. Any one who reads the whole transcript will see that what plaintiff means is that the losses were attributable to all of the troubles he had with defendants and all their acts which he regarded and regards as unlawful. Indeed he himself explained that when he used the phrases "lack of qualified or adequate major product" he meant "that the principal producers of motion pictures did not sell the quality pictures which you [he] wanted at the prices that you [he] thought were fair" [R. 874, 875]. To allow recovery on such testimony would in truth be to allow recovery for damage caused by conduct which the Oklahoma court has found to be innocent, and thus where plaintiff is estopped by judgment.

The sample that I have just quoted is repeated with minor variations with respect to perhaps a total of twenty different annual accounting periods each involving one of the plaintiff's eight operating companies. There are only the following four instances where plaintiff came near to offering evidence that specifically showed the extent to which the arbitration and credit conspiracies were a measurable cause of loss.

On Count 3 evidence was offered that twenty to twenty-five per cent of the losses in 1931 was due to "booking and arbitration" (R. 819). But to amalgamate those two causes of loss was a source of confusion, not clarification. If "booking" referred, as it may have, to "block booking," plaintiff was estopped from recovering on account of that practice [Ct. Ex. 3, fdg. 96, p. 72]. If it referred to general difficulties in booking, neither all nor most of such difficulties were shown to have been incurred as a means of averting arbitration. Thus the jury had no evidence as to what percentage of losses at Wewoka in 1931 were attributable to arbitration; and it is not claimed that in that year (or indeed in Wewoka in any year) any loss was due to the credit conspiracy.

On Count 6, evidence was offered that in 1931 "lack of major product and * * * booking difficulties" caused losses of $4,-000 to $5,000 (R. 789). Like the example in the previous paragraph, the jury had no basis for saying how much of that loss, if any, was caused by attempts to avert arbitration.

On Count 7, evidence was offered that forty to fifty per cent of the drop in gross receipts from $30,082.50 in 1927 to $21,-422.30 in 1928 (R. 871) and to $29,755.65 in 1930 (R. 876) was due to arbitration practices. (R. 892). The difficulty with the claim for losses in 1928 is that there was no segregation between the period before and the period after May 6, 1928, the date of the bar of the statute of limitations. As to 1930, the showing of causation was, in my opinion, adequate and therefore recovery could be allowed for that year except for two points already made: first, that there were no specific claims of arbitration made in 1930; and second, that if there were general claims the evidence does not show that plaintiff's company undertook a specific prejudicial rearrangement to avert the claims. Should I be wrong in these conclusions, plaintiff would be entitled on this count to, at best, fifty per cent of the difference between $30,082.50 and $29,755.-65 or $163.43.

On Count 8 evidence was offered that if it had not been for the arbitration conspiracy the company's gross receipts would have been $13,000 more in 1930 (R. 561-562. Compare 569), and $11,933.85 more in 1931 (R. 562 Pl. Ex. 44); and that if it had not been for the arbitration and credit conspiracies the company's investment would have been $30,000 more. With respect to this count my conclusion is that plaintiff went sufficiently far in showing to what extent the arbitration conspiracy was the cause of loss; and a directed verdict against him on that count is warranted, only on the grounds set forth in the analysis of count 8. In substance, those grounds are that the proof does not show that losses were incurred by plaintiff's company in an effort to avert arbitration and that if losses were incurred they were not reasonably charged to defendants as a method of averting unspecified arbitration claims.

The conclusion which I have reached to the effect that directed verdicts for defendants must be entered on counts 1-6, 9 and

10 for failure to establish that defendants' arbitration and credit conspiracies were the jural cause of plaintiff's companies' losses is not contrary to the authorities on which plaintiff relies.

In Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, plaintiff in a suit under § 7 of the Sherman Act, 15 U.S.C.A. § 15 note, complained that it sustained two sorts of losses as a result of defendant's unlawful conspiracy: (1) losses from selling goods at lower prices to meet defendant's prices, and (2) diminution of the value of its property. It showed the conspiracy and its losses and it gave as its only explanation defendant's violation of the Anti-trust laws. However, defendant sought to show that the first type of losses was speculative (pages 562–566 of 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544) and that the second type of losses was due to plaintiff's financial condition and lack of capital. (page 566 of 282 U.S. 555, 51 S. Ct. 248, 75 L.Ed. 544). The trial judge charged the jury that the two types of losses could be recovered only if "the old prices were reasonable, and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts of the" defendants. (pages 561, 562 of 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544). A verdict for plaintiff having been returned, it was upheld in the Supreme Court of the United States in the face of an attack on the ground not only that the first type of damages was speculative but that the second type of damages was uncertain in its cause.

The difference between that case and the case at bar is that plaintiff gave one cause for its losses—defendant's violation of the Anti-trust laws—and the jury was free to agree that losses were due in a "measurable degree" (page 566 lines 20, 21 of 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544) to violation of the Sherman Act. Here, except for the loss of $163.43 in 1930 shown under count 7 and for the losses in 1930 and 1931 shown under count 8, plaintiff himself gave multiple causes for the losses and he did not try to measure or estimate the degree to which defendants' arbitration and credit conspiracies were an important cause. Reasonable men, on or outside of a jury, could not tell whether these conspiracies were a dominant cause, a substantial cause or a minor cause. Even if in a private Antitrust suit I assume that it is enough to show that defendant's unlawful acts were a more substantial cause of loss than any other known cause (an assumption upon which no case seems yet to have squarely ruled and upon which I do not rule) plaintiff in this case made no such showing, except as noted in counts 7 and 8.

Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, was a suit brought under § 7 of the Sherman Act as amended by § 4 of the Clayton Act by motion picture exhibitors against distributors. Defendants had conspired to maintain a discriminatory system of releasing motion pictures under which plaintiffs' theatre was not free to secure as early as their competitors films which had not previously been shown. 327 U.S. pages 261, 262, 66 S.Ct. 578, 579, 90 L.Ed. 652. In order to show first, that this conspiracy caused damage to them and second, how much damages they suffered plaintiffs offered two sorts of evidence. They showed first, a comparison during the period of the conspiracy of the earnings of plaintiffs' theatre with the earnings of a comparable theatre to which defendants had made releases earlier than it accorded plaintiffs'; and second, a comparison of plaintiffs' own gross receipts less film rental during two periods: the 1933–1937 period when only single features were the fashion and plaintiffs had enough film which had not previously been shown by competitors, and the 1937–1942 period when double features were the fashion and plaintiffs were not able to secure from defendants enough film which had not previously been shown by competitors. On this showing the jury returned a verdict for plaintiffs which, on appeal, defendants attacked primarily on two grounds: first, that it was not certain that defendants' wrongful acts caused damage to plaintiffs (327 U.S. page 263 lines 10–13, page 264 lines 5–13, pages 267–268, 66 S.Ct. 579, 580, 581, 90 L.Ed. 652), and second that the damages were not certain. The Supreme Court held that neither point was well made.

In the case at bar we are chiefly concerned with the Supreme Court's ruling on the first point—certainty of causation in a private Anti-trust case.

It is crucial to observe the precise facts and conclusions on that point in the Bigelow case.

In that case plaintiffs' complaint was founded solely on defendants' conspiracy to establish a system of discriminatory releases. (327 U.S. pages 253, 254, page 261 lines 21–23, 66 S.Ct. 578, 90 L.Ed. 652). On the evidence the jury could have found that the only factors surrounding plaintiffs' operations which changed from the 1933–1937 period to the 1937–1942 period and which differed from factors surrounding competitors' theatres were: (1) plaintiffs' inability to secure at an early date and without discrimination all defendants' films which were needed, (2) competitors' ability to secure such films early enough to charge higher prices (327 U.S. page 260, 2nd full paragraph; page 262, lines 5–11, 66 S.Ct. 577, 578, 579, 90 L.Ed. 652) and (3) plaintiffs' change from single booking in the 1933–1937 period to double-booking in the 1937–1942 period. This third factor can be disregarded because plaintiff in giving figures for the two periods 1933–1937 and 1937–1942 offered not gross receipts simpliciter but gross-receipts less film rentals; and thus plaintiff put an exact dollar and cents figure on what was the financial effect of this third factor of change from single to double features. Perhaps the jury also could have found that defendants had conspired to fix exhibitors' admission prices. (327 U.S. page 261, lines 23–26, page 266, second full paragraph, 66 S.Ct. 578, 580, 90 L.Ed. 652). But the evidence on this last point was conflicting. And the Supreme Court construed the trial judge's charge and the verdict as showing that the jury had found that the fixing of minimum prices was the result of individual action; and that the defendants' only unlawful action was in conspiring to prevent plaintiffs' theatre from bidding in open competition against other exhibitors for a preferred place in an otherwise lawful system of release (327 U.S. pages 261, 262, 66 S.Ct. 578, 579, 90 L.Ed. 652).

From its opinion it is plain that the Supreme Court regarded the case as one in which all "other things being equal" (327 U.S. page 260 line 18, 66 S.Ct. 578, 90 L.Ed. 652) the difference between competitors' receipts and plaintiffs' receipts and the difference between net receipts (that is gross receipts less rental) in the two periods 1933–1937 and 1937–1942 could be found by the jury to be due solely to the establishment of defendants' discriminatory release system. Thus the ratio decidendi of the Bigelow case is that where the evidence in an Anti-trust case is such that the discrepancy between plaintiff's earnings and a competitor's earnings or between plaintiff's earnings in one year and another year could be found by a jury to be entirely unexplained except by acts of defendants which are unlawful under the Anti-trust laws then the jury may find defendants are the jural cause of the discrepancy, that is, of the loss.

In this statement of the ratio decidendi I am not unmindful of Chief Justice Stone's citations on page 265 of his opinion, 327 U.S., 66 S.Ct. 580, 90 L.Ed. 652. Some of the cases and some of the illustrative examples in Restatement, Torts § 912, (particularly Illustration 12, p. 583), may go beyond the precise holding in the Bigelow case and may suggest that recovery is permissible in a private Anti-trust case if the plaintiff shows that (1) defendant has engaged in acts unlawful under the Anti-trust Acts, (2) plaintiff has had lower earnings than the earnings of (a) his own prior record or (b) a theoretically normal year or (c) a comparable competitor, (3) segregation and admeasurement of the causes of loss is impossible, and (4) the acts of defendant are, shall I say, the "preponderant," the "dominant," the "main" or "a substantial," or "among the known factors the most substantial" factor in causing the loss. I need not develop this suggestion or try to decide which of the quoted phrases is correct, in view of what I say two paragraphs below. But I may observe that the problem, as Chief Justice Stone's citations show, is the recurrent problem of certainty of causation in statutory and non-statutory torts. Cf. Restatement, Torts § 431; Prosser, Torts, pp. 322–324; Smith, Legal Cause In Actions of Tort, 25 Harv. L.Rev. 103; McLaughlin, Proximate Cause,

39 Harv.L.Rev. 149; Green, Rationale of Proximate Cause, 132–141.

Clearly plaintiff in the case at bar does not fall under the ratio decidendi of Bigelow's case. (With the exceptions of parts of Count 7 and 8 to which I have referred and which are intended to be excluded from the present discussion) he did not offer evidence from which the jury could infer that plaintiff's companies' losses were entirely unexplained except by defendants' unlawful acts. On the contrary, he gave many causes the relative force of which he did not estimate.

Likewise, plaintiff does not come within what may be called the suggestions of the Bigelow case. Plaintiff was able, when asked, to give precise dollars or ·percentage figures with regard to the effect of defendants' arbitration ˙conspiracy at Pawhuska and at Alva, that is on counts 7 and 8. His failure to give equally precise figures elsewhere is not explained. Thus there is no basis for concluding that "segregation and admeasurement of the causes of loss is impossible" [See two paragraphs above]. Moreover, in the case at bar plaintiff's testimony leaves it entirely at large whether defendants' arbitration and credit conspiracies were a cause of the order of 5% or 25% or 51% or 90% of the losses referred to in Counts 1–6, 9 and 10. Such vagueness will not satisfy the statutory prerequisite that plaintiff sustain the burden of proving that he has been "injured in his business" (15 U.S.C.A. § 15). Even if the statute be given a loose construction because of (1) the important statutory policy of crushing restraints of trade by Anti-trust laws, (2) the Congressional desire to induce private persons to act as enforcing agents of those statutes, and (3) the recognition that private persons will rarely recover for their business injuries from Anti-trust laws if they are held to too meticulous a calculation of causes of business loss, [Compare Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979],— nonetheless the loosest construction would require a plaintiff in a private Anti-trust case to bear the burden of proving that defendants' unlawful acts within the statutory period were either a cause of a specific fraction of his losses or, at any rate,

a more substantial cause of his losses than was any other known factor. And in counts 1–6, 9 and 10 at bar plaintiff has left his own testimony so that no one can reasonably say that defendants' arbitration and credit conspiracies were of a specific magnitude or were a more substantial factor than defendants' block booking or defendants' acquisition of theatres, or defendants' limitation of distribution, or defendants' refusal to make prices as low as plaintiff thought fair, or defendants' use of plaintiff's competitors as preferred outlets, —none of, which could properly be regarded by a jury (limited by the evidence and rulings in this case) as action unlawful under the Anti-trust laws. The seriousness of this gap in the proof is underlined when it is remembered that if this Court ignores this plaintiff's failure to measure the various causes of his loss, the Court will deprive defendants of the benefit of the estoppel by judgment which they earned in Oklahoma.

Parenthetically it should be stated here that to show the effect of defendants' conspiracy upon his companies plaintiff introduced some evidence of the successful operations of competing exhibitors who were not subject to the conspiracy. Such evidence was admissible under the Bigelow case but the difficulty with using competitors as a standard in the case at bar is that these competitors' figures on gross receipts less film rentals were never shown. Moreover, these competitors were free not only from defendants' unlawful arbitration and credit practices, but also from defendants' other practices referred to in plaintiff's declaration most of which have been conclusively established by the Oklahoma judgment [Ct. Ex. 3] to be innocent. Therefore, it was not enough for plaintiff to show how much competitors earned. If he was to use them as a standard he had to show how much they would have earned if they had been subject to all defendants' lawful practices and had been free only of the unlawful practices regarding arbitration and credit.

The discussion so far has covered only the first eight counts which embrace the operating companies. For reasons ex-

plained in the appended analyses of Counts 9 and 10, the direction of verdicts for defendants on the first eight counts requires the direction of verdicts for defendants on Counts 9 and 10 where the alleged assignors, a realty company and a managing company, claim that their losses were a proximate result of the losses of the operating companies.

In directing these verdicts I have not relied on the point raised by defendants in their motion of January 23, 1947 that with the single exception of count 8 (R. 564) there is no clear proof that plaintiff holds the assignments on which he sues. Any one who reads the colloquies during the trial (R. 489, 490), the jury address of defendants' counsel (R. 1130 line 3), and the statement in the Court's charge that "there is no dispute about the fact of the assignment," a statement to which no exception was taken (R. 1180) knows that it would be a shabby thing to direct verdicts on this point. If the failure more clearly to show the assignments were the significant, and were the only ground on which defendants were entitled to prevail, I would merely set aside the verdicts and grant a new trial under Rule 59 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. This would be fairer than to direct verdicts on the basis of what might be regarded as the Court's mistake as well as plaintiff's counsel's omission.

There remains for consideration defendants' motion for setting aside the verdicts. Defendants, relying on Rule 50 (b) of the Rules of Civil Procedure as interpreted in Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L. Ed. 147, urge me to pass on this motion even though I have granted their motion for directed verdicts and for judgment for defendants.

It is doubtful whether the draftsmen of the rules and the Justices who participated in the Montgomery Ward case realized in what a dilemma their rule might in some cases place a trial judge and what foresight, abnegation and stultification it might require of him. But this case serves as an illustration.

As shown by my action on the motion for a directed verdict, my present views are, for example (1) that, as a matter of law, defendants had not conspired to use their arbitration machinery to force exhibitors to show films in any particular order, (2) that, as a matter of fact, a jury could not reasonably find that defendants had used arbitration claims with the intent of procuring from plaintiff's companies their assent to fresh obligations under new contracts prejudicial to those companies; (3) that, as a matter of fact a jury could not reasonably say that plaintiff's companies' losses were incurred in a reasonable effort to avert claims of arbitration and threats thereof, and (4) that, as a matter of fact, a jury could not reasonably find that defendants' unlawful acts were either the most substantial known cause of, or a measurable cause of, the damages complained of in counts 1-6, 9 and 10.

But for the purpose of the motion to set aside the verdicts I must assume that an appellate court will hold these views erroneous in part or in toto. Except on that assumption my action on a motion to set aside verdicts would be meaningless.

Yet I am not clear what I should assume to be the views which will be held correct by an appellate court. That court might hold that my present view as to points 1 and 2 above is wrong and that my charge was correct in stating that the jury could find that "when a dispute arose which would go to arbitration, the defendants in order to take advantage of that situation would force the plaintiff's assignors to rearrange their playing schedules as the price of avoiding arbitration; that is to say, the plaintiff says that the motion picture producers instead of collecting dollars and cents under the arbitration provisions of the standard contract, used that arbitration provision as a lever to make a new arrangement with respect to the showing of pictures, which arrangement was undesired by the plaintiff and was unfavorable to him" (R. 1186). If the court so held I ought not to set aside the verdicts because of error in my charge.

484

That court might hold that my present view as to points 3 and 4 above is wrong, and that a jury could find that plaintiff's companies were reasonable in incurring all the losses they sustained to avert arbitration claims and that those losses were the most substantial factor in the losses of which plaintiff's companies complained and that therefore plaintiff was entitled to all the damages which the jury allowed. If the court so held I ought not to set aside the verdicts because they are excessive.

Or that court might hold that my present view as to points 3 and 4 above is wrong, and that a jury could find that plaintiff's companies were reasonable in incurring some of the losses they sustained to avert arbitration claims, and that such losses as were reasonable were a sufficiently substantial factor in the losses of which plaintiff's companies complained or were sufficiently identified and measured so as to allow plaintiff to recover up to a prescribed amount on each count. If the court so held, the verdicts ought not to be set aside if plaintiff is willing to file remittiturs, the size of which no one can know until the appellate court speaks and sets the prescribed amount.

In this dilemma it seems to me unsound for me now to set aside the verdicts either on the ground of the type of error of law to which I have referred or on the ground that the verdicts are excessive.

But two other grounds are pressed.

██ First, it is said that, as this Court must have observed better than any other tribunal could observe, this jury did not understand the case. To be sure, this jury must have found it difficult to follow the testimony particularly the documentary testimony which was read to it for hours at a time. Also this jury must have found it difficult to analyze complicated financial records and lengthy contracts which it has taken me sitting in chambers many days to scrutinize. But those considerations operate to some extent in almost every complicated Anti-trust case. It is immaterial if I could imagine a more satisfactory and scientific tribunal than a jury for such a controversy. Together Congress and the parties, not a judge, have the power to decide what is the appropriate tribunal. Congress, perhaps even with the purpose of aiding plaintiffs in Anti-trust suits and stimulating recoveries, has given the plaintiff a right to demand a jury trial, and this plaintiff has demanded it. And the jury which the parties got in this case was not less competent, less attentive or less workmanlike in its performance and the trial was no more absurdly remote from scientific precision than can be expected in the average jury trial of a complicated Anti-trust controversy.

Second, it is contended that the part of the jury's verdict which deals with the amount of interest recoverable by plaintiff shows that the jurors did not understand the case or comply with the Court's instructions and that the jurors' failure of understanding and of compliance vitiates the part of the jury's verdict which deals with the amount of principal recoverable by plaintiff. This argument derives its basis from the fact that on all of the counts the jury expressly calculated interest from what is confessedly too early a date, sometimes even from a date before plaintiff was injured. But this contention is not sound.

On the record in this case, on each count the verdict on principal is as separate from the verdict on interest as though the Court had submitted two separate interrogatories upon issues of fact. (Compare Rule 49 of Rules of Civil Procedure.) The separation is in the physical form of the jury's verdict. And the separation was underlined by the further facts that interest was calculated (1) in response to an instruction given by the Court at a time separate from the charge with respect to the case as a whole, and (2) by the jury at a time after it had finished and reported its verdict on principal—a verdict which it never was authorized to, and did not, change. The correctness of the conclusions in this paragraph can be shown by a hypothetical case. If interest on his losses is not recoverable by a plaintiff in an Anti-trust case, and the only irregularity complained of with respect to a verdict like the ones in this case at bar were that the verdict included interest, it can not be doubted that a court would not set aside the verdict but

would sustain a judgment based solely on the part of the verdict dealing with principal.

Since the two parts of the verdict were separate, error in one did not necessarily vitiate the other as a matter of law. Nor in this case did the error in one part vitiate the other part as a matter of fact. There is not (and in view of the secrecy surrounding a jury's deliberations there can not be) any showing that the jurors' errors in arriving at the part of the verdict which deals with interest extended to or infected the part of the verdict which deals with principal. If it were open to me to make a conjecture, I should infer that the error did not so extend and that the jurors' confusion was limited to the question of interest, a question which they considered when they were fagged out after two days' deliberation and without detailed instructions from the Court.

Nor can it accurately be said that the two parts of the verdict are condemned by the provisions of Rule 49(b) regarding inconsistent verdicts. Those provisions operate only when the jury is required to give a general verdict as well as to give answers to interrogatories. Where the jury is required to give only answers to interrogatories, inconsistencies in answers or in the reasoning necessarily underlying them do not always require a court to set aside a verdict. Suppose for example, a court asked a jury these two questions: (1) what were the principal losses, if any, of plaintiff on counts 1 and 2 and (2) what interest, if any, do you allow on such losses. And the jury answered question (1) "$100 on count 1, nothing on count 2" and simultaneously answered question (2) "nothing on count 1, $5 on count 2". Surely defendants could not object (though perhaps plaintiff could) if the court entered judgment for three times $100 on count 1. That principle applies to the verdicts in this case.

Finally plaintiff moves that the Court disregard the jury's final expression upon interest and calculate the judgment upon the losses of the principal amounts stated in the jury's original verdict plus interest at 5% from the date of the assignment of the causes of action to plaintiff to the date of judgment. This motion is denied because I shall not enter a judgment for plaintiff unless directed to do so by an appellate court which can instruct me on the interest question if it is material.

Defendants' motion of January 20 for directed verdicts granted.

Defendants' motion of January 27 for entry of judgment for defendants granted with costs.

Defendants' motion of January 23 for directed verdicts denied.

Defendants' motion to set aside verdicts denied.

Plaintiff's motion for interest on verdicts denied.