MOMAND v. UNIVERSAL FILM EX-
CHANGES, Inc., et al.

UNIVERSAL FILM EXCHANGES, Inc., et
al. v. MOMAND.

Nos. 4291, 4292.

United States Court of Appeals
First Circuit.

Dec. 21, 1948.

George S. Ryan, of Boston, Mass., for A. B. Momand.

Jacob J. Kaplan, of Boston, Mass. (Irving J. Helman and Nutter, McClennen & Fish, all of Boston, Mass., on the brief), for Universal Film Exchanges. Inc., et al.

Before MAGRUDER, Chief Judge, and GOODRICH and WOODBURY, Circuit Judges.

GOODRICH, Circuit Judge.

This is an anti-trust suit for treble damages by the assignee of ten corporations, which were at the times complained of engaged in the motion picture business in Oklahoma, against eight major motion picture producers and distributors. The plaintiff, though assignee, sues in his own right. The complaint alleges that the defendants conspired to violate the federal anti-trust laws by twenty of their business practices. After the jury had rendered a verdict for the plaintiff, the trial court directed a verdict for the defendants and entered judgment thereon. Both sides have appealed.

Prior to the commencement of any litigation, the plaintiff and his father operated motion picture theaters in twelve Oklahoma cities and towns. They later formed thirteen separate Oklahoma corporations to operate these theaters. Some of the grounds and buildings occupied by the theaters were owned by a fourteenth Oklahoma corporation called Momand Realty Corporation. A fifteenth corporation named Momand Theatres, Inc. was formed

in Delaware in January, 1929, as a management company, and it acquired the stock of the thirteen operating companies referred to above. The stock of Momand Theatres, Inc. was in turn owned by the plaintiff and his father "largely, with perhaps some minor stockholders."

On April 13, 1931, and again on December 31, 1933, the plaintiff took assignments from each of these fifteen corporations of their causes of action under the anti-trust laws against a number of motion picture producers, distributors and exhibitors, among whom are the defendants in the present case.

While the plaintiff's argument covers a wide range of territory, his counsel frankly stated at the oral argument that he would be content if the verdict of the jury was reinstated. This verdict was reached after a lengthy trial in which the District Court had limited the plaintiff's proofs to two of the liability-creating business practices out of the twenty originally alleged.[1] The reason for this limitation was former litigation in Oklahoma. Another limitation was imposed by the trial judge also, and this related to the period of time for which the plaintiff was entitled to complain.

Our discussion, therefore, falls conveniently into three divisions. The first concerns the correctness of the action of the District Court in directing a verdict for the defendants because of failure of the plaintiff's proof on the two charges concerning which he was permitted (and encouraged) to offer proof. The second part of the discussion concerns itself with the question whether the plaintiff was correctly limited to proof of the two charges instead of twenty. This involves a question of res judicata arising out of the earlier Oklahoma litigation which will be described later. The third point which must be discussed is whether the District Court was correct in limiting the plaintiff as he did to the time during which plaintiff could claim recovery. If these three questions are resolved in accordance with the rulings of the District Court, there will be no occasion to consider any basis for appeal which the defendants may have to offer.

## Was There Evidence To Support A Verdict For Plaintiff?

We turn first, therefore, to the question whether the plaintiff made out a case for recovery on the evidence he offered. Only two grounds of alleged conspiracy were left open to him. One of these had to do with recovery of loss sustained from the operation of the arbitration clauses[2] in the standard contract then in effect between distributors and exhibitors of pictures. The other had to do with certain credit practices[3] on the part of distributors followed by these defendants. All the rest of the plaintiff's twenty grounds of complaint were ruled out by the District Judge because he held that the plaintiff was pre-

---

[1] These practices related to the compulsory arbitration provisions of the standard exhibition contract and the organization of credit committees and uniform enforcement of their rules. A third practice of the defendants, the fixing of a minimum admission fee of ten cents, was also open to proof. But the plaintiff has made no claim of injury based on the minimum admission fee. See footnote 7 infra.

[2] The clause provided for compulsory arbitration of disputes under contracts between distributors and exhibitors. Awards of the arbitration boards were to be conclusive. Upon failure of the exhibitor to submit to arbitration or abide by an award, the distributor party to that contract, and all others having like contracts with the exhibitor, were to demand security from him on every contract. If the exhibitor failed to post security within a fixed time, all distribu-

tors were to suspend service under their contracts, and after ten days' suspension could cancel the contract if by that time the exhibitor had not posted security or obeyed the award. See Paramount Famous Lasky Corp. et al. v. United States, 1930, 282 U.S. 30, 37-41, 51 S.Ct. 42, 75 L.Ed. 145.

[3] Credit committees were set up by the film boards of trade in each locality. Their function was to make certain that purchasers of theaters assume and perform completely the outstanding contract obligations of their vendors. The sanction, as in the case of the arbitration clause, was a requirement that security be posted, and in addition expulsion from the film board of trade for refusal to submit credit information. See United States v. First National Pictures, Inc., et al., 1930, 282 U.S. 44, 49-53, 51 S.Ct. 45, 75 L.Ed. 151.

cluded from recovery upon them by the action of the court in the Oklahoma litigation previously referred to. We assume for the purpose of discussion under this point that the plaintiff was properly limited to these two grounds of complaint.

Plaintiff's claim based on credit practices may be disposed of briefly. Those practices are involved in only two counts.[4] The evidence on both counts consists of testimony of the plaintiff to the effect that, had it not been for the arbitration and credit conspiracies, the receipts of these theaters would have been greater than they were. No part of the loss claimed was separately attributed to the credit conspiracy. Indeed, as will appear below, arbitration and credit practices were more often lumped with other causes which were not liability-creating. It is apparent, also, that the substance of plaintiff's claim in this part of the case is that threats of arbitration forced him to follow a course that ruined his business. The following discussion, therefore, is applicable to the credit practices where they are involved, although reference will be made only to arbitration practices.

■ The plaintiff introduced in evidence twenty-one arbitration claims, totalling $10,332.35, made against him by the defendants. He never paid any of these claims, but rearrangements were worked out in each case settling the differences between the parties. No direct damage resulted, therefore, from these arbitration claims, for the plaintiff paid nothing and incurred no expenses in connection with them. Plaintiff does not controvert this, but he argues that many more than twenty-one claims must have been filed, and that he could not have been expected to remember them all. While this argument may justify an inference that the scope of the arbitration conspiracy was greater than twenty-one claims would indicate, it does not prove that other claims caused more loss than the samples produced, which showed no direct loss at all.

No evidence appears in the record to show that these arbitration claims were presented to induce any of plaintiff's assignors to enter into disadvantageous obligations. From plaintiff's own account of conversations with representatives of defendants, nothing appears from which an intention to injure plaintiff's theaters may be inferred. The subject matter of the arbitration complaints consisted of disputes arising upon contracts already made and alleged to be broken and no prospective arrangements were involved. Nor did plaintiff offer evidence of a single prejudicial new obligation which any of his assignors undertook to escape an arbitration claim or threat. In the instances where there were settlements following arbitration disputes, there is no showing of injury caused by the rearrangement, but only a general charge that the pictures were undesirable. In reviewing specific disputes, the plaintiff was at a loss to remember whether any arrangements made were undesirable to him, and could only say broadly that some arrangements made were desirable and some undesirable. Indeed the settlement of the claims resulted in reduced rentals of films to the plaintiff. This is hardly proof of specific injury resulting from defendants' illegal practices. We turn, then, from the particularized to the more general aspects of this claim.

Suppose we assume that the plaintiff did, contrary to what has been said above, incur large losses in trying to avoid the impact of the arbitration practices complained of. Is recovery for them permitted under the rules of law governing allowance of damages?

■ The plaintiff claims that at least ten profitable theaters were reduced to operation at a loss and then were forced out of business entirely. The jury verdict would award him a sum, when trebled, approaching $1,000,000. We think he cannot recover any sum of that magnitude for two reasons. First, the substance of his present claim is that the arbitration machinery was used to force poor pictures and late bookings upon him. But the booking difficulties of the plaintiff's theaters were a major source of complaint in the Okla-

---

[4] Count No. 4, Clinton, and No. 8, Alva. Both are summarized in the appended analyses to the opinion of the District Court, R. 229-231, 242-244. The reported opinion in D.C.1947, 72 F.Supp. 469 does not contain these addenda.

homa litigation. It was there found that the defendants had not conspired with respect to the selection or timing of motion picture bookings. Damage from these sources is, therefore, not open to proof in this case if the res judicata rulings are correct, and for the discussion under this head, we assume that they are. Second, even if any claim were free of the estoppel rulings (and none appears to be) the plaintiff's course of conduct must be evaluated in the light of the threatened harm which he was seeking to avoid. So far as the record shows, that harm consisted specifically of approximately $10,000 in arbitration claims and generally, perhaps, of a number of additional claims not individually proved. The basis, then, of the plaintiff's claimed loss measured in the hundreds of thousands, must, under the estoppel rulings, be found in a claim against him of some $10,000. If plaintiff, without showing any specific intent of defendants to injure him or any specific damaging transaction, proceeded voluntarily to make business arrangements which caused damages running to one third of a million dollars, that conduct was too extravagant to be charged to defendants. The point is ably and fully discussed in the District Court's opinion, 72 F.Supp. 469, 476, 477. We approve what is said there, and see no need to review the question further.

We come, then, to the important question of causation. The plaintiff shows that defendants have engaged in illegal practices. He shows also that his business deteriorated for several years and was eventually dissolved. Did defendants' practices cause the damage? What proof must plaintiff offer? What proof did he offer?

The degree of certainty required of a plaintiff in proving causation of damage. is necessarily elastic. It varies with the nature of the case. Particularly in an anti-

trust suit, covering as it must many imponderables, rigid standards of precise proof would make a plaintiff's task practically hopeless.

We are not without guidance in this matter from the opinions of the Supreme Court. In Bigelow v. R.K.O. Radio Pictures et al., 1945, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, an exhibitor was permitted to recover treble damages on a showing of conspiracy to discriminate against him in the release of films, and proof of loss of earnings in comparison with his own pre-conspiracy earnings and the post-conspiracy earnings of a comparable competitor not subject to the discrimination. In Eastman Kodak Co. v. Southern Photo Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, and Story Parchment Co. v. Paterson Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, verdicts were sustained on a similar comparison of pre-conspiracy and post-conspiracy conditions of plaintiff's business.[5] But the significant point in this case is emphasized by the statement of the Supreme Court in the Bigelow case, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652: "* * * the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

In the cases just cited, the illegal practices of defendants constituted the only active cause of plaintiff's injuries. Defendants did not show that other factors were substantially contributing causes. On such facts, plaintiffs in those actions, having shown harm to them from defendant's liability-creating conduct were not to be deprived of recovery by hair-splitting re-

[5] In the Story case, the court said 282 U.S. on page 562, 51 S.Ct. on page 250, 75 L.Ed. 544: "It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."

quirements that they prove damages exact in amount.

The case before us is different. There are a number of factors acknowledged by plaintiff to have contributed to his injury. But the usual rule in tort is that a plaintiff may recover for loss to which defendant's wrongful conduct substantially contributed, notwithstanding other factors contributed also. Restatement, Torts § 431 (1934). However, the defendant's contribution must be substantial and it must be shown by the evidence. All this is hornbook law and no one would dispute it.

■ The new problem in this case, however, grows out of the earlier litigation of matters here involved. In an original claim for injury allegedly caused by a number of practices in violation of the anti-trust laws, there would be no need for the plaintiff to particularize the injury caused by each illegal practice. All the practices would be responsible for all the injury, and the portion of loss due to each would be immaterial. In this case, however, the plaintiff has already litigated the issues involved in the twenty business practices charged as illegal. It was decided in the earlier lawsuit that in only two of these respects had defendants conspired as charged. If the res judicata rulings in this case are correct, the plaintiff is now in the position of having his shotgun replaced by a rifle. He can no longer spread his fire over the whole range of the defendants' business practices. He must concentrate on two. And if the res judicata rulings are to be given full effect, the injury alleged must be allocated to the illegal practices in some manner that can be reasonably measured. To put it another way, if the plaintiff in his first lawsuit seeks to collect a total loss due to all of the allegedly illegal practices of the defendants, and the court in that case finds only two practices illegal, a verdict for the plaintiff in a second lawsuit on the same grounds cannot stand without proof that the two illegal practices caused the loss. Otherwise the defendants would be obliged to pay losses caused by conduct which was determined not to be liability-creating in their particular case. What did the plaintiff show?

■ On all but two counts, the plaintiff offered no specific evidence at all as to the damages attributable to the arbitration conspiracy. As we have already noted, he showed no direct damage from the twenty-one arbitration claims submitted, which he did not pay, and no specific disadvantageous obligation undertaken to avoid arbitration. He said only, in effect, that his future business arrangements were made to avoid threats of arbitration, that those arrangements were undesirable, and that his business was ruined. This is obviously insufficient evidence to support a jury verdict and the trial court correctly so held.

On two counts (7 and 8), the plaintiff testified that a stated percentage or amount of loss was due to arbitration practices. If there were any specific information in the record to support this opinion testimony, we would agree that he had made out a supportable claim. But we can find no shred of specific proof which would permit a jury to infer that the plaintiff's opinion was reasonably based upon fact. On a reading of this part of the record, we reluctantly conclude that plaintiff's testimony was at best a guess in response to prodding questions directing his attention to the arbitration conspiracy. It is obvious, also, that plaintiff was attributing to the arbitration practices his losses from booking difficulties, which claims were foreclosed to him by the estoppel rulings.

■ To sum up: It is well appreciated that a plaintiff has a difficult task in an anti-trust suit and that adherence to strict requirements of proof as to exact quantity of damage may deprive him of the substance of his rights. The law has gone far to ease that burden by permitting proof of losses which border on the speculative, in order to implement the policy of the anti-trust laws. But a fair degree of certainty is still essential to show the causative relation of defendants' misconduct and plaintiff's injury. Especially must this be so where a number of causes exist, and because of earlier litigation, recovery cannot be had for losses due to most of them. Moreover, a general assertion of injury will not suffice when plaintiff's own testimony fails to specify whether any of the

business arrangements mentioned by him were or were not disadvantageous. The District Court properly ruled, therefore, that there was not sufficient evidence to support a verdict for plaintiff on the issues open in the case. We pass then to the question whether the res judicata rulings unduly restricted the issues.

### Res Judicata Effect Of The Oklahoma District Court Judgments.

The present state of facts raising questions of res judicata developed in the following manner. It will be remembered that the plaintiff and his father organized the various corporations who are the assignors of the plaintiff in this lawsuit. These corporations made their assignments to him on April 13, 1931 and again on December 31, 1933.

The first suit was commenced April 17, 1931, in the United States District Court for the Western District of Oklahoma against the present defendants and others. That action was dismissed without prejudice on April 19, 1937.

The plaintiff then split the litigation into three parts. The present action was commenced June 7, 1937. Also in 1937, the plaintiff brought two actions in the United States District Court for the Western District of Oklahoma, Nos. 6516 and 6517, 37 F.Supp. 649. In Oklahoma 6516, the defendants are the same as here except Metro-Goldwyn-Mayer Distributing Corporation (Metro) which is a defendant here but was not a defendant in 6516. In 6517, plaintiff named other defendants than those in the present action. Vitagraph, however, one of the defendants here, was and is a wholly-owned subsidiary of Warner Bros., a party defendant in 6517.

In all three actions—the present one and Oklahoma suits 6516 and 6517—the plaintiff first alleges what he has characterized in this litigation as the "generic conspiracy," a combination on the part of the

defendants to monopolize and restrain interstate commerce in motion pictures by twenty of their business practices.[6] In the present action, plaintiff then sets out in ten counts the alleged effect of this conspiracy upon ten of the assignor corporations. In Oklahoma 6516 he complained of injury to five other assignor corporations and two of the ten involved here. In 6517 he complained of injury to all fifteen of the assignor corporations.

The Oklahoma actions (6516 and 6517) were consolidated for trial and concluded before the present case came to trial on the merits. From the findings in the Oklahoma consolidated trial, this much is clear and pertinent to the res judicata rulings: the defendants were found to have conspired in violation of the anti-trust laws only by (1) using standard exhibition contracts and taking concerted action to enforce the compulsory arbitration provisions therein, and (2) adopting and enforcing credit committees' rules concerning the credit statement and rating of vendees of theaters who had not assumed the licensing contracts of their vendors.[7] Defendants were found not to have conspired in the other respects charged. In the suit numbered 6516 it was found that the plaintiff had suffered no injury from the defendants' unlawful conduct. In the suit numbered 6517, the plaintiff recovered judgments against two corporations not parties here and lost as against the others named.

In order to give res judicata effect to the Oklahoma judgments, two problems must be resolved. The first concerns the relationship of the parties. The second involves issues of the compulsory joinder of causes of action and suggests interesting excursions into the codifiers' hunting ground where elusive concepts like "cause of action" are tracked down.

▆▆ The problem as to the parties concerns principally Metro. In all the cases the plaintiff is the same.[8] All the defend-

---

[6] These practices are summarized in the District Court's opinion, 1947, 72 F.Supp. 469, 472.

[7] It was also found in the Oklahoma cases that the defendants had conspired to fix a minimum admission fee of ten cents. The trial judge in the present case ruled that the plaintiff also had the benefit of this finding, but the plaintiff has made no claim based on this practice of the defendants.

[8] As the assignee of the total claim of each assignor corporation, the plaintiff is the real party in interest in each ac-

ants in the present case except Metro were defendants in Oklahoma 6516. In 1936, however, one year before Oklahoma 6516 was instituted, Loew's Inc. acquired all the assets and assumed the liabilities of Metro. Loew's Inc. was a defendant in Oklahoma 6516. It is clear, therefore, that Loew's and Metro are in privity.[9]

The plaintiff's argument against the application of the doctrine of res judicata to his claim against Metro in the present case leads us into the second problem. He contends that he has a separate claim against Metro for its conduct before the merger of Metro with Loew's. He argues further that the cause of action he asserted against Loew's in Oklahoma 6516 was for the tortious conduct of Loew's itself. Therefore, says the plaintiff, the cause of action against Metro has never been prosecuted and the merger of Metro with Loew's should not destroy that cause of action.

■ Fortunately we need not resolve the interesting questions of the separate identity of causes of action and their compulsory joinder which are raised by the plaintiff's argument.[10] The reason we are relieved from doing so is that, whether or not the causes of action, if separate, had to be joined, they were in fact joined. Metro's part in the alleged conspiracy was set out in Oklahoma 6516, and the court

there expressly found that Loew's was a party to the illegal practices "* * * through the agency of Metro-Goldwyn-Mayer Distributing Corporation * * *." The conspiracy issues were thus litigated with respect to Metro in Oklahoma 6516, and the plaintiff in the present case may not relitigate those issues.

■ The same analysis applies to Vitagraph which is a party defendant here but was not named in Oklahoma 6517. All the named defendants in 6517 were different from those named in the present case. Warner Bros., however, was a party defendant in 6517, and Vitagraph was and is a wholly owned subsidiary of Warner Bros. The consolidated findings in Oklahoma 6516 and 6517 expressly state that Warner Bros. was involved in the illegal practices in part through Vitagraph. The same rule, therefore, applies to the Warner-Vitagraph as applies to the Loew's-Metro relation and the rule of collateral estoppel, as that phrase is used in the Restatement of Judgments, applies.[11]

What has been said thus far establishes a proper relationship of the parties for the application of the doctrines of res judicata. A further problem, however, takes us back to the questions of separate identity and joinder of causes of action. The plaintiff contends that he is asserting a separate

---

tion. Federal Rules of Civil Procedure, rule 17(a), 28 U.S.C.A. He is not suing in a representative capacity. He is, therefore, not merely the same representative or formal party as, for example, a trustee of two separate estates. See Restatement, Judgments, §§ 80, 81, (1942).

[9] Hart Steel Co. v. Railroad Supply Co., 1917, 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148.

[10] The problem may be illustrated by the following hypothetical situation: In year 1 corporation A causes injury to P in violation of the anti-trust laws. In year 2 corporation A merges with corporation B. In year 3 corporation B injures P in violation of the anti-trust laws. Both injuries arise out of a continuing conspiracy to which A and B, when separate, were parties. In year 3, P sues corporation B for the second injury, and a judgment is rendered in that case. May P later sue corporation B for the first injury done by corporation A before the merger? If the causes of action

are separate, nothing in the Federal Rules appears to compel their joinder. Only counterclaims arising out of the same subject matter must be asserted under Rule 13(a). The broad concept of "cause of action" as including all the operative facts which might reasonably have been litigated in the first lawsuit would indicate that the plaintiff here was obliged to state all his claims in the Oklahoma litigation. But this we need not decide. See Clark, Handbook of Code Pleading § 19, p. 137 (2d ed. 1947); 1 Moore, Federal Practice § 2.04, especially p. 160 et seq. (1938); Restatement, Judgments, § 62, comments c-j inclusive (1942).

[11] Restatement, Judgments, Ch. 3, Introductory Note: "* * * If a valid and final judgment for money is rendered in favor of the plaintiff, the cause of action is merged in the judgment, and he cannot thereafter maintain an action on the original cause of action (see § 47). If a valid and final personal judgment is rendered in favor of the defendant on the

cause of action for the injury alleged to have been caused by the defendants to each operating company. He contends also that Momand Realty Corporation, which was in the position of lessor to a number of the operating companies, and Momand Theatres Inc., which was the management head of all the operating companies, had as many separate causes of action for the injuries done to them as there were operating companies.

The resolution of these questions will be material only to determine whether the plaintiff is barred by the earlier judgments from asserting any cause of action at all, or whether only the matters of fact found for or against him in the earlier litigation will be foreclosed to him in the present case. Assuming, therefore, without deciding, that as to the operating companies the plaintiff had separate causes of action, it is clear that collateral estoppel is properly applied in this case to prevent the plaintiff from relitigating questions of fact which were decided against him in the earlier lawsuits. It is clear, also, that as to Momand Realty Corporation and Momand Theatres Inc., collateral estoppel applies. Furthermore, as to these two corporations no claim of damage can be supported if, as we have already decided, there is no proof that damage to the operating companies was caused by the illegal practices of the defendants. The trial court's ruling that proof of the claims of the operating companies could not involve relitigation of fact issues decided in the earlier Oklahoma case was, therefore, correct. Whether or not the trial court was correct in ruling that suit on any claim of Momand Realty or Momand Theatres was barred by the earlier litigation, the claims of these companies

fall for lack of proof of damage to the operating companies.

Plaintiff's final contention in this phase of the case is that the law as the federal court in Oklahoma applied it has been changed by recent United States Supreme Court decisions and that, therefore, the doctrines of res judicata should give way to a more favorable climate of judicial opinion than that existing at the time of the Oklahoma litigation. We do not think they should. The plaintiff had a full trial in Oklahoma of all the issues arising out of his dealings with the defendants. He could have appealed from the judgments of the Oklahoma District Court, but he did not do so. He took no part in creating the more favorable climate of opinion in the appellate courts, if such exists, although he had an opportunity to do so. We think that the policy that there be an end to litigation prevents him from now asserting that changed climate as a basis for relitigation of issues once decided.

Two further points merit brief mention. First, the trial court in the present case ruled that certain practices which the Oklahoma District Court had found defendants had followed and which that court declared illegal were to be treated conclusively as illegal practices here. In Oklahoma 6516, however, it was further found that no damage resulted to the plaintiff, despite the illegal practices, and final judgment was entered for the defendants. That left the defendants with no grounds for appeal, unless, as has happened here, the plaintiff had appealed. Under the principle of Restatement, Judgments § 69(2), comment c, defendants should not have been collaterally estopped from relitigating the issues decid-

---

merits, the original cause of action is barred by the judgment (see § 48)."

\* \* \* \* \* \* \* \*

"Where, however, the subsequent action is based upon a different cause of action from that upon which the prior action was based, the effect of the judgment is more limited. The judgment is conclusive between the parties in such a case only as to matters actually litigated and determined by the judgment. The judgment is not conclusive as to matters which might have been but were not litigated

and determined in the prior action. (See § 68).

"A judgment, therefore, has not only a direct effect upon the cause of action upon which the action in which the judgment is rendered was based, by way of merger or bar, but also has a collateral effect upon other causes of action involving the same parties, by way of what in the Restatement of this Subject is called 'collateral estoppel.' (See § 45, Comment c.)"

ed against them. But this point would be material only if this case were to go back for a new trial.

Second, assuming the correctness of the res judicata rulings, the plaintiff argues that he was prevented from proving a new conspiracy not previously charged, a conspiracy to destroy the plaintiff's business. This is of a piece with the too generalized character of the plaintiff's proof. Of course a new conspiracy would be open to proof in this case and the trial judge said so over and over again. But a conspiracy to destroy a business must take specific forms to achieve that end. Attention must be directed to the practices and conduct by which the defendants sought to accomplish their purpose. At no point does the plaintiff present, nor does the record reveal offers of evidence to show that anything beyond the twenty already familiar business practices is involved.

The res judicata rulings, so far as they are material to the disposition of the case, are correct. We go on to the issue of time limitation.

### Time Limitation.

A separate trial was held in this case in 1942 on the issue of time limitation. D.C., 43 F.Supp. 996. The trial judge ruled "that no recovery could be had against any defendant for alleged wrongs before May 6, 1928, or subsequent to December 31, 1933." [12] He also ruled that action against Loew's was completely barred, and that action against Columbia was barred for wrongs alleged to have occurred before August 27, 1931. The correctness of these rulings is now before us.

Our first inquiry is what statute or statutes of limitations apply. The Sherman Anti-Trust and Clayton Acts, 15 U.S.C.A. § 1 et seq., which create the federal causes of action, have no internal statute of limitations. The applicable law, therefore, is the law of the state in which the suit is brought, Massachusetts.[13]

Massachusetts has a six-year tort statute of limitations [14] which would close the period prior to June 7, 1931, six years before the commencement of the present action. But Massachusetts also has a borrowing statute of limitations which provides: "No action shall be brought by any person upon a cause of action which was barred by the laws of any state or country while he resided therein."[15] This provision applies to the plaintiff who has been continuously a resident of Oklahoma.

The Oklahoma statute of limitations applying to "an action upon a liability created by statute other than a forfeiture or penalty" is three years.[16] Another section of the Oklahoma statute states that if a plaintiff who brings a timely lawsuit fails in that action otherwise than upon the merits and the period of limitations has run, he has one year more within which to renew the suit.[17]

The present plaintiff on April 17, 1931 instituted a suit against the defendants here and others in the United States District Court for the Western District of Oklahoma which was dismissed without prejudice on April 19, 1937. Commencement of the Massachusetts action in June, 1937 gave the plaintiff the advantage of the Oklahoma one year extension as to those counts in the Massachusetts action which may be taken to have been set out in the original Oklahoma complaint. This applies to the first eight counts and the tenth count of the original complaint, but not to the ninth count which was first set out in an amendment to the complaint, filed Au-

---

[12] The terminal date of December 31, 1933 is the date of the second set of assignments from the various assignor corporations to the plaintiff. The assignments did not purport to cover any period after that date, and the plaintiff does not seriously argue that they did. Any causes of action accruing to the assignor corporations after that date, therefore, never came into the plaintiff's hands.

[13] Cope v. Anderson, 1947, 331 U.S. 461, 463, 67 S.Ct. 1340, 91 L.Ed. 1602.

[14] G. L. Mass. (Ter. Ed.) c. 260, § 2.

[15] G. L. Mass. (Ter. Ed.) c. 260, § 9.

[16] 12 Okl.St.Ann. § 95, par. 2. The defendants contended in the trial court that the two year bar of paragraph 3 of the above section applied. The trial judge, however, applied the three year provision quoted. Since this ruling was favorable to the plaintiff, we do not stop to discuss the question whether the two or three year provision is applicable.

[17] 12 Okl. St. Ann. § 100.

gust 27, 1934.[18] The matters in this count are, therefore, open only from August 27, 1931.

A further limitation is occasioned by the time lapse between the two sets of assignments from the theater companies to the plaintiff. The first set was made April 13, 1931, the second December 31, 1933. The causes of action arising after April 13, 1931 were not transferred to the plaintiff until December 31, 1933, and were first pleaded in the final amended complaint of August 27, 1934. Since, even with the one year saving clause of the Oklahoma statute of limitations, the period not limited to the plaintiff is three years prior to the time the causes were first pleaded, the cut-off date for matters first pleaded on August 27, 1934 is August 27, 1931. Therefore, the period from April 13, 1931 to August 27 1931 was correctly held closed to the plaintiff as to the causes of action passing to him under the second set of assignments.

As to Loew's which was dropped as a defendant in the pleading of August 27, 1934, the action is barred. The Oklahoma extension does not apply and no other provision preserves the cause of action against Loew's.

The effect of the tolling provision of the Clayton Act remains to be considered. Section 5 of the Clayton Act, 15 U.S.C.A. § 16, provides: "Whenever any suit or proceeding in equity or criminal prosecution is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, the running of the statute of limitations in respect of each and every right of private action arising under said laws and based in whole or in part on any matter complained of in said suit or proceeding shall be suspended during the pendency thereof." Two relevant government anti-trust suits [19] were pending against all the defendants in this action except Loew's and Columbia, from June 20, 1928 to July 21, 1931, a period of three years, one month and one day. Adding that period to the six year Massachusetts period we have nine years, one month and one day, which, as to the matters in the present suit which were also involved in the government prosecutions, preserves plaintiff's causes of action back to May 6, 1928. This is measuring from June 7, 1937, the day this action was begun. The government prosecutions concerned credit practices, uniform contracts and the arbitration provisions thereof, which were the same issues open to plaintiff after the res judicata rulings discussed in the second section of this opinion. As to these matters, plaintiff was permitted to go back to May 6, 1928.

The tolling provision does not apply, however, to defendant Loew's nor to Columbia, which were not defendants in the government prosecutions. As to Columbia therefore, plaintiff may not go back of August 27, 1931, three years prior to the date of the first pleading in which the December 31, 1933 assignments were included. And as to Loew's, action is barred completely, as noted above, by the operation of the Massachusetts borrowing statute of limitations and the applicable Oklahoma statutes.

One more minor limitation is occasioned by the fact that we are dealing with two sets of assignments. The time during which the government anti-trust suits were pending when added to the Massachusetts six year period of limitation, takes us back to May 6, 1928. The trial court gave the plaintiff the benefit of this earlier starting date as to those causes of action which were not barred by the operation of the shorter Oklahoma period of limitation, as applied by the Massachusetts borrowing statute. The bar of the three year Oklahoma statute, as we said above, falls at August 27, 1931 as to those causes of action first set out in the final amended pleading of August 27, 1934. Since the causes of action passing to the plaintiff under the second set of assignments of December 31, 1933 could not have been set out until the filing of the 1934 pleading, the bar of the

[18] These counts are analyzed in the District Court's opinion, 1942, 43 F. Supp. 996, 1002 (par. 16), 1004 (par. 29), 1009 (pars. 16-19 incl.)

[19] United States v. First National Pictures, 1931, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 and United States v. Paramount Famous Lasky Corp., 1931, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145.

Oklahoma statute cuts off those which accrued before August 27, 1931. But here the tolling provision of the Clayton Act suspends the running of limitation until July 21, 1931, the date when the government suits terminated. Therefore those causes of action arising after April 13, 1931 (the date of the first set of assignments) and before July 21, 1931 are preserved by the Clayton Act. But those arising after July 21, 1931 and before August 27, 1931 are not preserved, and the Oklahoma statute bars them. This is what the trial judge held, and if there was any error in it, it was in the plaintiff's favor, and not a matter of which he can complain.

To summarize in the words of the trial judge "* * * Loew's does not have to respond to any cause of action here alleged; Columbia may have to respond for causes of action which accrued between August 27, 1931 and December 31, 1933; and the other defendants may have to respond for as long a period as Columbia and also * * * for such causes of action as arose out of credit policies and uniform contracts * * * between May 6, 1928 and July 21, 1931 * * *."

As to this phase of the case, the plaintiff raises a number of objections, only three of which merit discussion here: (1) that the amended pleading of August 27, 1934 should relate back to April 13, 1931 as to all matters pleaded, thus opening the period from April 13 to August 27, 1931 which the trial judge had ruled closed as to matters first pleaded on August 27, 1934; (2) that a statute of limitations should not be taken to run against claims for injuries caused by a continuing conspiracy until the commission of the last overt act causing damage; and (3) that the claim against Loew's as successor to Metro for Metro's alleged wrongful conduct should not be barred along with the claim against Loew's for its own conduct.

The answer to the first objection is set out in the trial judge's finding 19. Assuming that damages were occurring to the plaintiff's assignors day by day after the assignment of April 13, 1931, new causes of action were accruing. They came into the plaintiff's hands by the assignment of December 31, 1933. But these causes of action were first pleaded August 27, 1934 and could not relate back to a pleading made in 1931 when the plaintiff did not possess them. Having been first pleaded on August 27, 1934, the three year bar of the Oklahoma statute of limitations falls at August 27, 1931, and the trial judge correctly so ruled.

The plaintiff's second objection as to when the statute of limitations begins to run in a conspiracy case is based on a misreading of criminal cases [20] in which it was said that the continuance of a conspiracy depended upon the commission of overt acts, and that the statute of limitations did not begin to run against a criminal prosecution until the last overt act performed in compliance with the original agreement had been accomplished. It is another and greatly different thing to say, as the plaintiff impliedly does, that a private right of action for damages arising out of a conspiracy does not accrue until the conspiracy is ended, irrespective of the time when the injury is inflicted. On this theory a single act of damage in an antitrust case would be subject to no period of limitation so long as the conspiracy continued, although no further injury was done to the plaintiff. Nor could the plaintiff, on this reasoning, sue in the meantime. All the conspirators would need to do to escape suit is to keep the conspiracy in operation. We have found no authority to support this view. We think the trial court properly ruled that a cause of action for each invasion of the plaintiff's interest arose at the time of that invasion and that the applicable statute of limitations ran from that time.

The third objection is that Loew's was erroneously excluded from responding to the plaintiff's cause of action against Metro, whose assets and liabilities Loew's had acquired in 1936. It may be that the plaintiff is correct in his contention that Loew's should have been required to respond for the part of plaintiff's claim

---

[20] See United States v. Kissel, 1910, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; United States v. Johnson, 3 Cir., 1947, 165 F.2d 42; Eldredge v. United States, 10 Cir., 1932, 62 F.2d 449.

asserted against Metro. The amendment to the plaintiff's complaint which first set out the claim against Loew's for the alleged torts of Metro was filed after the findings in the separate trial on the limitations issues but before the entry of the order in that trial. The order barring suit against Loew's technically barred the claim set out in the amendment referred to. But, in any event, Metro continued as a defendant in this case. Proof of any claim against Metro was not restricted on this ground, and presumably a recovery against Metro would have had to be paid for by Loew's. The plaintiff, therefore, has not been prejudiced by the trial court's disposition of this question, for he has failed to prove that Metro caused him any loss, and has not reached the problem of executing a judgment against a corporation now merged with another corporation.

The judgment of the District Court will be affirmed.