The HAVERHILL GAZETTE COMPANY, Appellant,

v.

UNION LEADER CORPORATION, Appellee.

UNION LEADER CORPORATION, Appellant,

v.

The HAVERHILL GAZETTE COMPANY, Appellee.

Nos. 6175, 6191.

United States Court of Appeals First Circuit.

June 8, 1964.

Robert H. Goldman, with whom Frank Goldman, Lowell, Mass., Joseph F. Bacigalupo, Lawrence, Mass., and Goldman, Goldman & Curtis, Lowell, Mass., were on brief, for The Haverhill Gazette Co.

James M. Malloy and Ralph Warren Sullivan, Boston, Mass., with whom Malloy, Sullivan & Sullivan, Boston, Mass., was on brief, for Union Leader Corp.

Before HARTIGAN and ALDRICH, Circuit Judges, aud GIGNOUX, District Judge.

ALDRICH, Circuit Judge.

These cross-appeals by the Haverhill Gazette Company (Gazette) and Union Leader Corporation (ULCo) from a final judgment in Gazette's favor following the confirmation of a master's report mark the third time this case has been before us. In Union Leader Corp. v. Newspapers of New England, Inc., 1 Cir., 1960, 284 F.2d 582, cert. den. 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744, we affirmed a decree granting an injunction against ULCo forbidding certain conduct in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, but vacated the decree insofar as it granted relief in ULCo's favor. In In the Matter of Union Leader Corp., 1 Cir., 1961, 292 F.2d 381, cert. den. 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190, we affirmed the action of the district judge in charge of the case in refusing to disqualify himself in response to an affidavit of prejudice. Following this the district court referred the suit to a special master for a determination of the damages caused Gazette by ULCo's wrongful conduct. The master found single damages in the amount of $29,442. The court overruled Gazette's objections to the report and entered a judgment in Gazette's favor for $88,326 (the trebled amount) together with $60,000 as statutory attorneys' fees and $8,000 expenses. Gazette's appeal alleges the damage findings to have been grossly inadequate. ULCo appeals from the award of counsel fees. It also objects to the failure of the court to consider one of the grounds on which it claims that Gazette, or more exactly the purchaser of all of Gazette's common stock, Newspapers of New England, Inc.,[1] and others, were themselves guilty of violating sections 1 and 2 of the Sherman Act, and section 7 of the Clayton Act, 15 U.S.C. § 18. This opinion will

---

1. Since renamed Haverhill Publishing Co., Inc.

be concerned only with Gazette's appeal.[2]

The facts, many of which were recited in detail in our first opinion, will be referred to in part as we proceed. The basic fact we now start with is that Gazette entered the damage hearing with comprehensive findings in its favor indicating serious and continuous illegal activity of many sorts by ULCo over a period of years, and "stupendous losses," whether or not as a result of ULCo's wrongdoing, and wound up with a finding of damages in an amount of comparative insignificance.[3] Gazette contends, inter alia, that this resulted from the master's erroneously "compartmentalizing" the issues, citing Continental Ore Co. v. Union Carbide & Carbon Corp., 1962, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777, and placing too severe a burden upon it as to each item and, further, by disregarding the findings of the district court. ULCo, on the other hand, takes the position that the findings of the master are to be accepted unless plainly wrong, and that they were not.

Because it has an important bearing on precisely what was before the master and the scope of the inquiry open to him, we must consider the prior proceedings with some particularity. At the time of the referral the posture of the case was superficially usual, but actually highly unusual. The issues initially tried to the court were stipulated to be "every issue pertinent to the granting or refusing of an injunction," and "every issue of lia-

bility." The trial, exclusive of substantial preliminaries, lasted two weeks. It resulted in an opinion containing a comprehensive summary of findings, pursuant to which the court entered a "Partial Final Decree." Consistent with the stipulation the decree recited,

"11. Pursuant to Rule 54 of the Federal Rules of Civil Procedure, 28 U.S.C., this Court expressly determines that there is no just reason for delay in entering final judgments on the following claims:
\* \* \*.

all claims for injunctive and declaratory relief. \* \* \* "

It thereupon entered "final judgments" with respect to all paragraphs of its order except the reserved damage claims. It added,

"However, if an appellate court should regard these orders not as final but as interlocutory, and if the parties would not have the benefit of the appeals available under 28 U.S.C. § 1292(a) (1), this Court, in accordance with 28 U.S.C. § 1292(b), is of the opinion that the orders in paragraphs 1, 2, 3, 4, 5, 8, 9, 10, and 11 involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

---

2. In view of our present disposition, the size of the award of counsel fees becomes moot, as doubtless the court will wish to reconsider that matter at a later date under the new circumstances. With respect to ULCo's contention as appellant on the merits, this is something that, so far as this litigation is concerned, should have been presented on the original appeal from a judgment, finding no liability and denying relief as to the relevant separate claims, which was specifically stated by the district court, upon the determinations required by F.R.Civ.P. 54 (b), to be final. Cf. Sears, Roebuck & Co. v. Mackey, 1956, 351 U.S. 427, 76 S. Ct. 895, 100 L.Ed. 1297; Cold Metal Process Co. v. United Eng'r & Foundry Co., 1956, 351 U.S. 445, 76 S.Ct. 904, 100

L.Ed. 1311; Bendix Aviation Corp. v. Glass, 3 Cir., 1952, 195 F.2d 267, 38 A. L.R.2d 356. We do observe, however, that ULCo's brief appears to rest upon a misconception of the district court's pretrial statement. The court did not say that "any evidence offered as to an outside market would be excluded," but merely indicated that it was "probable" that it would regard such evidence as unnecessary. This was not a ruling on which one could base rights. We will not now consider whether the matter in question was as fully tried out as it could have been.

3. ULCo's brief describes it as "relatively microscopic."

Our first opinion did not discuss the question whether, or to what extent, the partial decree was final or interlocutory. In its order of reference, following our affirmance, the district court stated, "The only issues now being left for adjudication relate to damages. These are precisely analogous to issues of damages which would be raised in patent, copyright, and like cases following an appellate adjudication on issues of liability. Such cases are customarily referred to a Master for the ascertainment of damages."

█ It is here that the difficulties, and they are serious, commence. Except for the sometime question of increasing the damages because of the nature of the infringement, 35 U.S.C. § 284 (a matter the statute reserves exclusively for the court in all cases), the issues of patent infringement and damages are separate and clear-cut. Although ascertainment of damages may involve difficult questions of apportionment, see, e. g., Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills, Inc., 3 Cir., 1945, 147 F.2d 209, cert. den. 293 U.S. 595, 55 S.Ct. 109, 79 L.Ed. 688, there is no overlapping of the issues determined by the court, finally, 28 U.S.C. § 1292(a) (4), and those referred. In a private antitrust action liability and damages are not separate. Granting that an injunction may require a finding of merely threatened loss, 15 U.S.C. § 26, a partial decree on all issues of liability, however considered, implies

much more. One cannot think of private liability for violation of the antitrust laws except in terms of impact and damage.[4] See, e. g., Stearns v. Tinker & Rasor, 9 Cir., 1958, 252 F.2d 589, 605–606, cert. den. 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741; Freedman v. Philadelphia Terminals Auction Co., 3 Cir., 1962, 301 F.2d 830, cert. den. 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67; Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 1936, 85 F.2d 742, 750, cert. den. 299 U.S. 613, 57 S.Ct. 315, 81 L.Ed. 452; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 1934, 72 F.2d 885, 887. Indeed, the district court itself, in its opinion confirming the report, stated that its original judgment had "determined" that ULCo's "invasion [of Gazette's rights] caused Haverhill Gazette to suffer damages." The master at one point had recognized this determination, stating that a certain finding "embodie[d] a conclusion by the District Judge that the wrongful acts of ULC inflicted some substantial damage upon the Gazette." Yet although this was what the master said the court had found, and what the court agreed it had found, we discover that in its original opinion the court said that it was "not concerned with the assessment of damages, if any." The master, with similar ambivalence, stated that the reference permitted him full latitude to determine "the precise nature and scope of the damage," and a careful study of his report reveals that this meant to him, too, "damage, if any."[5]

4. "[A]ny person who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * *." Clayton Act § 4, 15 U.S.C. § 15 (ital. suppl.). Private antitrust actions are not founded upon showing of unlawful conduct only, but upon injuries, to the protected interests, which are the legal result of the overt illegal acts.

5. There were three principal matters involved in the court's decree; the improper use of union representatives in connection with calls by ULCo's advertising solicitors in which advertisers were urged to boycott the Gazette; secret rate and other advertising discriminations, and illegal contracts with the eight merchants,

so-called, by which the merchants were to give all of their advertising to the Journal and were, posing as ostensibly disinterested parties, to boost the Journal and disparage the Gazette and persuade other businessmen to advertise exclusively in the former. The master found no damages whatever as a result of the first two illegal activities, and none with respect to the eight merchants except as to their own exclusive use of the Journal. Even as to this last the master carefully examined the evidence and indicated no awareness of any obligation, as the result of the court's prior findings, to find "substantial damages," or even any damages. We will deal with these matters later at more length.

 **803**

■ Thus we have the situation of the district court's entering not merely a permanent injunction, but a decree of liability which it labelled final, following an apparent finding of damage which, legally, would seem a necessary prerequisite. Yet at the same time the master was thought free to find the damage, *if any*, untrammelled by what went before to the point, as the court put it in its opinion confirming the report, of making an "independent and fresh appraisal on factual issues of causation and damages." Indeed, so "independent" was the master that the court held that while "he reached findings which do not square with statements made by this Court and by the Court of Appeals," his findings must be accepted unless "clearly erroneous." However, there had become applicable, if the decree of liability is to be considered final, the principle of collateral estoppel, Partmar Corp. v. Paramount Pictures Theatres Corp., 1954, 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532, making, in effect, conclusive as between the parties the "essential," Yates v. United States, 1957, 354 U.S. 298, 336, 77 S.Ct. 1064, 1 L.Ed. 2d 1356; prior findings. The Evergreens v. Nunan, 2 Cir., 1944, 141 F.2d 927, 152 A.L.R. 1187; 65 Harv.L.Rev. 818, 842–43.

■ Enough has been said to demonstrate that at least insofar as the court's partial decree is regarded as final there are serious internal conflicts. While aspects of the decree must be accorded finality we think it preferable under the circumstances to consider the decree of liability as merely interlocutory. This is the usual rule when liability is determined separately; a decree of liability which excludes damages is normally not a final decision. The Palmyra, 1825, 10 Wheat. 502, 6 L.Ed. 375;

Craighead v. Wilson, 1855, 18 How. 199, 15 L.Ed. 332; McGourkey v. Toledo & Ohio C. Ry., 1892, 146 U.S. 536, 13 S.Ct. 170, 36 L.Ed. 1079; 6 Moore, Federal Practice ¶ 54.13 at p. 125 (2d ed. 1953); Restatement, Judgments § 41 (comment a) (1942); cf. F.R.Civ.P. 56(c) expressly recognizing a summary judgment of liability alone as interlocutory. The Rule 54(b) certification, which was effective to make appealable under 28 U.S.C. § 1291 the court's decision on claims finally disposed of, could not affect the interlocutory character of the partial disposition of the treble-damage claim.[6] See Sears, Roebuck & Co. v. Mackey, 1956, 351 U.S. 427, 435, 437, 76 S.Ct. 895; 6 Moore, op. cit. supra, ¶ 54.30[1], at p. 232, n. 12.

On an interlocutory basis the court's findings as to damages, whether express or implicit, are subject to revision. However, as to one issue there has been a final judgment, and with respect thereto collateral estoppel must apply. Our decision on the first appeal ordering ULCo's complaint dismissed was upon the ground that the district court's finding of substantial advertising discriminations, dealt with on proper principles, amounted, on the court's subsidiary findings, to legal justification for defensive retaliation in kind by Gazette. This dismissal constituted, inescapably, a final judgment, cf. Smith v. Vulcan Iron Works, 1897, 165 U.S. 518, 17 S.Ct. 407, 41 L.Ed. 810, and ULCo stands bound by the essential underlying factual determination. At the outset of his report, after discussing this issue, the master correctly concluded that with respect to discriminations the record stood that "the wrongful acts of ULC inflicted some substantial damage upon the Gazette." However, seemingly because of an interpretation which we could not agree with[7]

6. That the judgment disposed of all issues on separate trial under F.R.Civ.P. 42(b) would, of course, affect neither finality nor appealability, Atkins, Kroll (Guam), Ltd. v. Cabrera, 9 Cir., 1960, 277 F.2d 922. We find it unnecessary to determine whether our jurisdiction on the prior appeal to review the decisions of liability

was based upon 28 U.S.C. § 1292(b), or upon the broad principle recognized in Smith v. Vulcan Iron Works, 1897, 165 U.S. 518, 17 S.Ct. 407, 41 L.Ed. 810.

7. The master felt that although there was a finding that damage was "inflicted" upon Gazette, this was not a finding "that

he concluded that collateral estoppel was inapplicable, and that Partmar was "dispose[d] of." We can not agree. The finding of substantial damage done to Gazette by ULCo's acts of discrimination was essential to the judgment dismissing ULCo's original action. This finding must remain for all purposes of the case. The dollar amount, of course, was not found, or even that this damage was ascertainable in dollars, but that is something else.[8]

■■■■ Although we conclude that with respect to ULCo's other illegal activities the master was free to find facts overriding the court's decree of liability construed as interlocutory only,[9] it does not follow that the present report in this regard is to be accepted. In the first place, we do not agree that the "clearly erroneous" rule applies uniquely to the master's findings. Rather, the prior findings of the court were themselves entitled

to consideration, and there was a burden on the master to be met before finding as to any issue embraced in or underlying the earlier decree, even though interlocutory, that the court was wrong, a burden which neither he, nor the court subsequently, recognized.[10] Furthermore, we find it difficult to agree with the court in its opinion confirming the report that the master had not been unduly hard to convince. By this we mean that we are not satisfied that he did not charge himself erroneously. Certainly he did not vocalize our caveat in Momand v. Universal Film Exchanges, Inc., 1 Cir., 1948, 172 F.2d 37, at 43, 42, cert. den. 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118, that while "a fair degree of certainty is still essential to show the causative relation of defendants' misconduct and plaintiff's injury," yet "in an antitrust suit, covering as it must many imponderables, rigid standards of precise proof would make a

ULC's wrongful acts were the sole cause or even the predominant cause of injury." Passing the question of just what injury this meant, and whether it expressed a proper standard of causation, a matter considered more broadly *infra*, it cannot be that the court's finding of substantial harm to Gazette as a result of ULCo's discriminations meant harm for which ULCo was not legally responsible.

8. We might say, in passing, that quite apart from the binding effect of the court's finding that Gazette was injured by ULCo's discriminatory conduct, we have great difficulty in understanding how the master reached his contrary factual conclusion. To take, as one example, the J. M. Fields matter, which the court has described as "most important," and a "serious discrimination," this involved, in part, a discriminatory guarantee not to raise the rate for two years, which the master found was "a substantial factor" in taking the business from Gazette. The master nevertheless found no damage, not merely that he could not measure it. As an "important" reason the master referred to the fact that the guarantee was never exercised. We do not follow the reasoning, and without going into details, we do not understand the findings. We would ask, *inter alia*, what was ULCo's point, on the master's analysis, of giving the guarantee at all?

9. There are a number of circumstances, notably the reception of new evidence, under which our affirmance of the interlocutory decree would not constitute a bar to redetermination of the question of liability in the court below. See, e. g., Toucey v. New York Life Ins. Co., 8 Cir., 1940, 112 F.2d 927, 928, rev'd on other grounds, 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100, 137 A.L.R. 967; Western Fire Ins. Co. v. University City, 8 Cir., 1942, 124 F.2d 698; cf. Alexander v. Nash-Kelvinator Corp., 2 Cir., 1959, 271 F.2d 524, 526.

10. One of the fundamental difficulties in this case, which we do not fully reach because the parties did not question the propriety of reference vel non, is the extent to which the master, as a different trier sitting on the damage hearings, not only could take new evidence, but could give different weight to evidence or make very different findings of credibility. Where the issues are to some extent interwoven or overlapping in such separate proceedings this may cause grave difficulties. See, e. g., Gasoline Prods. Co. v. Champlin Ref. Co., 1931, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188, and United Air Lines, Inc. v. Wiener, 9 Cir., 1961, 286 F.2d 302, cert. den. 366 U.S. 924, 81 S.Ct. 1352, 6 L.Ed.2d 384 (involving, additionally, questions of right to jury trial). Under present circumstances we adopt the rule above stated.

plaintiff's task practically hopeless." It is more than arguable that he did not apply it. At the least it can be said that in discussing the evidence the master gave more open consideration to ULCo's evidence and the negative aspects of Gazette's than to the more favorable features of Gazette's case. The fact, for example, that various advertisers could not, or would not, in 1962, recall that they were importuned by union members to use the Journal and not the Gazette, received much attention, and the contrary testimony of the representatives none. Similarly, the advertisers' testimony regarding lack of contact by the eight merchants, so-called, whom the court found Loeb illegally and "immorally" hired to act as apparently disinterested solicitors, was emphasized to the extent of not even referring to the testimony of some of the merchants themselves that for a period of nearly twenty months they spent, individually, up to forty hours a week making such contacts.[11] Nor did the master deal with the likelihood that the eight merchants did exactly what they said they did, not merely because they were paid, collectively, some $30,000 by Loeb for so doing, but because they were promised $1,000,000 and a quarter interest in the Journal if the Journal was successful in putting Gazette out of business. This truly extraordinary contract, and what might seem to be inevitable consequences, was dismissed in silence as the master concluded that (beyond effects on advertising of their own enterprises) the merchants' activities were so inconsequential as not to produce a single dollar.[12] While there is no obligation to discuss all of the evidence, cf. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 340–342, 70 S.Ct. 177, 94 L.Ed. 150, in total this was a substantial omission, particularly in the light of what had apparently been previously credited by the court. It is also relevant in view of our doubts as to the burden the master placed upon Gazette.

These other doubts take form because of the master's frequent use of the phrases "sole or predominant cause," and "a more substantial cause of harm than any other known cause." While he did this only in connection with rejecting, at the outset of his report, Gazette's interpretation of one particular statement in the court's opinion, and the master's ultimate conclusion was correct,[13] his use of and reliance upon this standard of causation was wrong. The fact that he never enunciated another strongly suggests that he may have employed the same standard throughout his report.

In using this standard the master purported to rely upon the decision of the district court in Momand v. Universal Film Exchanges, Inc., D.Mass., 1948, 72 F.Supp. 469, noting that the judgment had been affirmed. He failed to note, however, that "sole or predominant" was not the rule that we stated on the appeal.[14] Judge Goodrich, speaking for the court, returned to the Restate-

---

11. We do not think it necessary to distinguish to what extent the merchants may have "talked-up" the Journal as opposed to soliciting specific advertising or obtaining actual contracts.

12. No mention, either, was made of the court's finding that the result of this contract was "to intensify * * * zeal * * * to support The Journal by securing advertising for it and to discourage advertising in The Gazette by * * * enterprises subject to their influence," and Loeb's significant testimony. "XQ. And they assured you they would get as much advertising business for you as they possibly could, didn't they? A. Yes. XQ. And thy did that, didn't they? A. Yes."

If in this vital matter Leob was not merely misled, but totally mistaken, we think it was at least incumbent on the master to explain his mistake.

13. The court had stated that Gazette "had been put in peril of insolvency in the equity sense as a result of ULC's attempt to monopolize." Gazette endlessly seeks to magnify this. While, conceivably, the court's language was inexact, it is obvious that ULCo was not the sole cause of Gazette's difficulties, and that Gazette's construction is not only inconsistent with the facts, but with the entire balance of the court's opinion.

14. It is perhaps not altogether clear what the district court held. It is true that

ment and said, 172 F.2d at 43, "[T]he usual rule in tort is that a plaintiff may recover for loss to which defendant's wrongful conduct substantially contributed, notwithstanding other factors contributed also. Restatement, Torts § 431 (1934)." The difference between a "substantial" cause and one "more substantial than any other" is manifest. If the master put a burden on Gazette, as it may well be he did, to eliminate all proper causes for the shifting of advertising from Gazette to the Journal to the extent of affirmatively showing that the illegal causes were the sole or most substantial, we consider this too favorable treatment of a deliberate wrongdoer. If anything is clear in this case it is that the Gazette's union difficulties in a strongly union area were what furnished ULCo the opportunity to initiate and continue the Journal.[15] From the outset it capitalized upon this by illegal means, purposely and effectively designed to take advertising from the Gazette. After the strike was settled (and passing the question of whether ULCo's conduct may not have extended the date) ULCo engaged in massive illegal assaults upon Gazette's advertisers, discussed supra, which were considered, in ULCo's opinion, at least, of such extraordinary value. Certainly they, too, were expressly designed to accomplish exactly the losses which Gazette in fact suffered. For ULCo thereafter to be able to say, "Prove exactly what you lost and that it would not have been lost, anyway," would be to admit to a legal ineffectiveness that we should regret to contemplate. In our opinion it is enough to warrant the master in finding general damages that Gazette should show merely a substantial cause, rather than a cause more substantial than any other.[16] While

---

it did use the second of the two phrases quoted *supra*. However, the opinion began with a reference to section 912 of the Restatement of Torts to the effect that what was required was "proof that the tortious conduct was a substantial factor in causing such harm," 72 F.Supp. at 478, a much lesser requirement. Elsewhere the court stated that if "segregation and admeasurement of the cause[s] of loss [were] impossible" (seemingly apposite, on the master's opinion, to the case at bar, see *infra*) various phrases might be used to define the burden of showing causality, including "preponderant," "dominant," "main," or "a substantial," and that it would not "try to decide which of the quoted phrases is correct * * *."

15. See fn. 17, *infra.*

16. "The degree of certainty required of a plaintiff in proving causation of damage * * * varies with the nature of the case." Momand v. Universal Film Exchange, supra, 172 F.2d at 42; see Note, The Requirement of Certainty in the Proof of Lost Profits, 64 Harv.L.Rev. 317, 319 (1950). A degree of uncertainty may always be permitted, especially when the circumstances make it particularly likely that the claimant suffered loss at the wrongdoer's hands. Cf. Bigelow v. R. K. O. Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574; Clark, The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits, 52 Mich.L.Rev. 363, 367–93 (1954), Note, Antitrust Enforcement by Private Parties: Analysis of Developments in the Treble Damage Suit, 61 Yale L.J. 1010, 1016–19, 1025–26 (1952). In the antitrust case at bar uncertainty of cause is much less than it would be in the ordinary multi-competitor situation because until the Journal appeared in this admittedly one-newspaper area Gazette had no competition, and if the Journal had ceased publication it would have reverted to that status. In a very arguable sense whatever the Journal took, particularly after the strike ended, Gazette lost. This is, in other words, a harsh case in which to conclude, after proof of substantial violations of the antitrust laws directed at the claimant, that there was an unsatisfied burden of showing any legal damages because of some rigid rule of causation. The question is not primarily one of showing damage, but one of the extent of damage where there are multiple causes, none susceptible to precise measurement, which are in source independent and yet interact upon each other in producing injury. We note in the Restatement of Torts (1939), relied upon broadly in Momand, and by the master as well, that in a case where the damages cannot be precisely calculated because of the interaction of concurrent causes, there is no burden of excluding all other causes of loss, and that estimates based upon such evidence as is "reasonably available" under the circumstances may be accepted.

the master considered finding general damages, and declined to do so, we cannot tell under what circumstances he contemplated it, and the burden he imposed upon Gazette. His reference to the principle enunciated in Bigelow v. R. K. O. Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, that the risk of uncertainty should fall upon the wrongdoer, had attached to it the condition that "the difficulties of proof [must be] * * * the result of ULC's unlawful acts," (which he found they were not). Particularly in the sense that he used it, this was a far too narrow reading of Bigelow.

We turn, finally, to Gazette's largest claim, that ULCo is responsible for all losses caused by the Journal's very existence because the Journal was founded upon, and continued in, unlawful conduct of a most substantial nature. The master recognized this as a valid issue and defined it at the outset of the report.

"[I]t is conceivable that ULC would not have entered the Haverhill market, or remained there throughout the damage period, *had it not enjoyed the benefit of its own wrongdoing.* This possibility must be explored in order to make a thorough assessment of damages, for the early departure of the Journal from Haverhill would have materially improved the position of the Gazette." (Ital. suppl.)

It must be clear that whether any particular unlawful conduct was instrumental in causing the Journal to enter or remain in Haverhill must be determined by the effect that it had upon Loeb, ULCo's president and policymaker. If, in Loeb's mind, it was necessary to engage in particular acts in order to warrant remaining in business, then, in the true sense, those acts caused his being in business. This must have been so regardless of whether, in point of fact, he was correct in his appraisal. If, for example, Loeb felt that it was essential to obtain illegal assistance from the union in order to continue in business, it follows that his decision to continue, and hence his continuing, resulted from his success in accomplishing this unlawful act. The question is not whether, viewed from hindsight, the union cooperation did him any essential, or, indeed, any material good.[17] The master made this analysis at the outset, and properly addressed himself to what was Loeb's state of mind when deciding whether to enter Haverhill initially, finding, on this issue, against Gazette. He then, however, abandoned this approach, and applied a strict benefit-received rule, viewed, moreover, not as he concluded Loeb viewed it at the time, but as it appeared to the master in the light of the damage testimony which he credited. The issue, he stated, was simply whether Loeb would have stayed had he in fact not received the specific advertising benefits which Gazette had succeeded in establishing to the master's satisfaction.

Passing the extent to which the master erred in finding these benefits too small, the ultimate question must be not what

---

Section 912, illus. 12. See also comment d to that section. In fact, Bigelow suggests that the burden of excluding the effect of other causes may sometimes be upon the wrongdoer. See 327 U.S. at 264, 66 S.Ct. 574. Whether or when such a burden may be imposed is a difficult question which we find impractical to rule on without going deeply into evidentiary matters which have not been argued and which, conceivably, may not recur in the same form or context.

17. Launching a newspaper, as Loeb himself testified, is a very difficult undertaking, particularly at Christmas. Loeb himself was surprised at his success. The fact that Gazette's printers were on strike, with Haverhill being a particularly strong union area, was certainly a significant factor. It was not a factor attributable to Loeb. However, under these circumstances Loeb's subsequent capitalization on Gazette's union difficulties to the extent of obtaining specific unlawful union assistance (we agree with the master in not holding ULCo responsible for the union's independent activity on a theory of conspiracy) must have been regarded by him as highly important, if not vital, to his continuance.

benefits the master found in 1963, but what Loeb thought in 1958 and 1959. Moreover, even if Loeb's appraisal of the affirmative dollar benefits received coincided exactly with the master's, it still may have been that he believed that his losses would have been greater but for his illegal activities, or persistently took an optimistic view that matters would improve, which, absent these activities, he would not have entertained. The master's substantial misinterpretation and limitation of this issue was clear error.

There must be a new trial. Because of several of the matters discussed herein we find it impossible to separate what findings were infected by error. We accordingly vacate the report in its entirety. Furthermore, we believe that the damage issues should be submitted to a new trier. Where a trier of fact has been corrected for a number of serious errors there are bound to be strains on a second trial, conscious or unconscious, irrelevant to the issues, and hence disruptive. One may think one was not really wrong, and hence resist, consciously or otherwise, the new rules, or, conversely, lean over backwards. Alternatively, if one fully accepts the new principles it may be natural to over-emphasize them.[18] Because of this we have sometimes remanded a case for trial before another judge, not as a reflection on the first, but to avoid such complications. This is particularly important where a prior error related to the quantum or burden of proof. Murray v. United States, 1 Cir., 1962, 300 F.2d 804; Commissioner of Internal Revenue v. Young Motor Co., 1 Cir., 1963, 316 F.2d 267.

Judgment will be entered setting aside the judgment of the District Court and ordering the report of the special master to be vacated. Further proceedings to be not inconsistent with this opinion.

---

18. It should be unnecessary to say, but we do out of caution, that nothing stated in this opinion, or omitted therefrom, is indicative of our views on the merits, or is to suggest any particular result.